**Katherine DUGGAN, et al., Plaintiffs,**

v.

**Otis R. BOWEN, et al., Defendants.**

**Civ. A. No. 87–0383.**

United States District Court, District of Columbia.

Aug. 1, 1988.

1488

Stanley M. Brand, Abbe David Lowell, Sean Connelly, Brand & Lowell, Washington, D.C., William A. Dombi, Center for Health Care Law, National Assn. for Home Care, Washington, D.C., for plaintiffs.

Sheila Lieber, Jason R. Baron, Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM OPINION
AND ORDER

SPORKIN, Judge.

## INTRODUCTION

This case involves a challenge to the Department of Health and Human Services' ("HHS") administration of the Medicare home health care program. Plaintiffs take issue with the agency's interpretation and application of the "part-time or intermittent" care provision. I agree with plaintiffs that defendants' policy is contrary to the plain language of the Medicare Act and was promulgated in violation of the procedures required by the Administrative Procedure Act. Appropriate relief requires the certification of a nationwide class, the issuance of a declaratory order and the imposition of an injunction against further implementation of the challenged policy.

The named plaintiffs are seventeen elderly and sick Medicare patients, an association of home health care agencies, National Association for Home Care ("NAHC"), individual home health care agencies, and several members of Congress. They have brought this lawsuit on behalf of a nationwide class of elderly Medicare patients whom they claim are being injured by HHS' unlawful restriction of home health care coverage.

Plaintiffs lodge two separate but related causes of action. First, plaintiffs assert that HHS is using an unlawfully narrow definition of "part-time or intermittent care"—especially at the initial coverage determination stage of the four-step Medicare reimbursement process [1]—to deny home health care benefits to deserving patients. Second, plaintiffs charge that HHS "has abdicated its legal responsibility and thwarted the Medicare statute by delegating primary decisionmaking authority to private fiscal intermediaries without adequate supervision or regulatory mandate." Complaint at 6.

Plaintiffs contend that the upshot of their first cause of action is the unfair denial of benefits to a large class of elderly patients—especially those that lack the financial means, physical and emotional strength and tenacity to pursue an appeal of an initial declination of coverage. They claim that the prime product of HHS' wrongful delegation of authority to private intermediaries is a standardless system of *ad hoc* decisionmaking which leads to irrational, contradictory and unexplained home health care coverage determinations. Complaint at 6.

For their part, defendants contend that "plaintiffs raise vague, abstract, overbroad, premature and conflicting claims ..." and "fail to present a specific, concrete controversy appropriate for resolution by this Court." Defendants' Motion to Dismiss at 1. Defendants have interposed the usual procedural defenses in order to stop plaintiffs from receiving a hearing on the merits. For instance, defendants maintain that none of the plaintiffs has standing, that plaintiffs' claims are not ripe for adjudication, that this court lacks subject matter jurisdiction to review plaintiffs' claims, and that plaintiffs' claims are moot. Defendants also contest plaintiffs' charges on the merits.

Plaintiffs' causes of action are in very different procedural postures. Plaintiffs' "part-time or intermittent" care claim has been the subject of extensive briefing, a bench trial and several oral arguments. It is ripe for judgment. On the other hand, the broader "wrongful delegation" claim has now been stayed (before the completion of discovery) pursuant to the joint motion of the parties. *See* Order, May 16, 1988. Hence, this Memorandum Opinion and Order will focus exclusively on plaintiffs' part time or intermittent care claim; it constitutes my Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

At stake in this case are fundamental issues of judicial review, administrative law, statutory interpretation and most importantly, the access of elderly, sick and needy individuals to much-needed medical care.

---

**1.** This four step process is explained below.

## OVERVIEW

### A. *The Medicare Program and the Home Health Benefit*

The Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* is a system of health insurance for the aged and disabled. *See generally* Social Security Amendments of 1965, Pub.L. No. 89–97, Title I, 79 Stat. 286 (1965). It is administered by HHS through the Health Care Financing Administration ("HCFA"). The Medicare program consists of two basic parts. Medicare Part A provides coverage for the costs incurred by eligible beneficiaries for hospital care, extended care and home health care. *See generally* 42 U.S.C. §§ 1395c to 1395i–2. Medicare Part B is a voluntary program in which eligible beneficiaries who pay a monthly premium are entitled to reimbursement for physicians' and other medical services. *See generally* 42 U.S.C. §§ 1395j–1395w.

This case involves Medicare Part A. Services are provided under Part A by home health agencies ("HHAs") which enter into agreements with the Secretary to provide health care to persons eligible for Medicare. HHAs provide Part A services in patients' homes rather than in an institutional setting for two principal reasons—first, home services are more humane, and secondly, they are more economical. Home health services include: part-time or intermittent nursing care provided by or under the supervision of a registered nurse; physical, occupational or speech therapy; medical social services under the direction of a physician; and part-time or intermittent services of a home health aide. *See* 42 U.S.C. § 1395x(m).

Under the Medicare Act a beneficiary must meet certain conditions to receive home health care coverage. The patient must need skilled care while "confined to his home." 42 U.S.C. § 1395f(a)(2)(C).[2] The care must be medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). In addition, medicare coverage for home health care is limited to the "part-time or intermittent" care of a nurse and/or a home health aide. 42 U.S. C. § 1395x(m)(1) and (4).[3]

---

**2.** 42 U.S.C. § 1395f(a)(2)(C) provides, in relevant part:

**(a) Requirement of requests and certificates**

Except as provided in subsections (d) and (g) of this section and in section 1395mm of this title, payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1395cc of this title and only if—

. . . .

(2) physician certifies (and recertifies, where such services are furnished over a period of time, in such cases, with such frequency, and accompanied by such supporting material, appropriate to the case involved, as may be provided by regulations, except that the first of such recertifications shall be required in each case of inpatient hospital services not later than the 20th day of such period) that—

. . . .

(C) in the case of home health services, such services are or were required because the individual is or was confined to his home. . . . *and needs or needed skilled nursing care on a intermittent basis* or physical or speech therapy or, in the case of an individual who has been furnished home health services based on such a need and who no longer has such a need for such care or therapy, continues or continued to need occupational therapy; a plan for furnishing such services to such individual has been established and is periodically reviewed by a physician; and such services are or were furnished while the individual was under the care of a physician

. . .

(emphasis added).

**3.** 42 U.S.C. § 1395x(m)(4) provides:

**(m) Home Health Services**

The term "home health services" means the following items and services furnished to an individual, who is under the care of a physician, by a home health agency or by others under arrangements with them made by such agency, under a plan (for furnishing such items and services to such individual) established and periodically reviewed by a physician, which items and services are, except as provided in paragraph (7), provided on a visiting basis in a place of residence used as such individual's home—

. . . .

(1) part-time or intermittent nursing care provided by or under the supervision of a registered professional nurse;

. . . .

(4) to the extent permitted in regulations, part-time or intermittent services of a home health aide who has successfully completed a training program approved by the Secretary.

Plaintiffs and defendants agree that the "part-time or intermittent" care requirement is derived from the statutory definition of "home health services." The legislative history makes it clear that Congress intended the part-time or intermittent requirement to exclude more or less full-time care.[4] The relevant House and Senate Reports provide an identical description of home health care covered by Medicare:

> *Covered Service.*—The proposed post-hospital home health payment would meet the cost of part-time or intermittent nursing services, physical occupational, and speech therapy, and other related home health services furnished by visiting nurse agencies, hospital based home health programs and similar agencies. *More or less full-time nursing care would not be paid for under the home health benefits provision.*

*See* H.R.Rep. No. 213, 89th Cong. 1st Sess. 29 (1965) and S.Rep. No. 404, 89th Cong., 1st Sess. 32 (1965), 1965 U.S.Code Cong. & Admin.News 1943, 1974 (emphasis added).

The rationale for such an exclusion was simple: full time care generally would be provided more humanely and economically in an institutional setting. The dispute between the parties centers on what care is "part-time or intermittent" and hence appropriately rendered in the home, and what care is "full-time" and hence better provided in an institutional setting. Succinctly stated, plaintiffs have a different conception of what care qualifies as "part-time or intermittent" from that of defendants. The answer to this dispute, as discussed below, is found in the legislative history and the plain language and structure of the Medicare Act.

### B. *The Administrative Process*

Pursuant to his responsibility to determine benefits claims under Medicare Part A "in accordance with regulations pre-scribed by him," 42 U.S.C. § 1395ff(a), the Secretary of HHS has delegated much of the day-to-day administration of the Medicare Part A program to private fiscal intermediaries. The Secretary has also issued regulations which provide that private intermediaries—typically insurance companies—make the initial determination as to whether a particular service is covered by Medicare Part A. The Secretary had contracted with 47 different private intermediaries at the start of 1987, but was ordered by Congress to reduce the number of regional intermediaries to no more than ten by July 1, 1987. *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2326(b) (codified at 42 U.S.C. § 1395h(e)(4)).

The beneficiary has the right to appeal the private intermediary's initial coverage determination to the HCFA. The beneficiary has the right to pursue his or her appeal, if refused by the HCFA, before an Administrative Law Judge (ALJ), and ultimately to HHS' highest administrative appeals forum, the Appeals Council. Finally, if the beneficiary's claim exceeds $1,000, he or she has the right to judicial review of the Secretary's final decision in the same manner as is provided in 42 U.S.C. § 405(g) for social security claimants. *See* 42 U.S.C. § 1395ff(b)(2); 42 C.F.R. § 405.730; 20 C.F.R. §§ 404.981, 422.210.

### THE PROCEDURAL HISTORY OF THIS LITIGATION

This lawsuit was filed by plaintiffs on February 17, 1987. They filed a motion for partial summary judgment regarding their claim that defendants' definition of "part time or intermittent care" was erroneous. After the motion was fully briefed, I held a hearing on July 1, 1987.

At that hearing, plaintiffs contended that HHS' "part time *or* intermittent" care policy is applied substantially more restrictively, in effect requiring a Medicare patient to

---

4. The parties agree that the "part time or intermittent" requirement "distinguishes those patients who are suitable for treatment at home from those who more appropriately could be treated in an institution." Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 17. *See also Id.* at 18; Plaintiffs' Opposition to Motion to Dismiss and in Support of Class Certification and Partial Summary Judgment at 18 ("Defendants admit that the 'congressional intent [was] to provide for part-time or intermittent care while excluding ... care of such frequency that institutional care would be more appropriate.'").

demonstrate a need for both "part time *and* intermittent care." By merging those two separate concepts, plaintiffs contended, HHS unduly restricts eligibility for home health coverage. In addition, plaintiffs claimed that defendants' policy mandates that "daily" services provided more than four times a week be excluded from Medicare home health care coverage because such services are not "intermittent" or "part-time." Defendants considered home health care in excess of four days per week to be "daily" care. According to plaintiffs, the bottom line effect of defendants' interpretation of the "part time or intermittent care" requirement was that HHS did not cover home health aide services if they were required more than four days a week—regardless of the number of hours per day the Medicare patient needed such care.

Defendants took issue with the accuracy of plaintiffs' description of their policies and alleged that plaintiffs misunderstood their policy. Transcript at 27 and 31 ("They're mischaracterizing what the policy actually is."). According to defendants:

> Defendants' policy on intermittent or part-time home health care is a long-standing one. It's been in effect in its present substance since 1966.... It doesn't say what plaintiffs claim it does.

*Id.* at 28. Defendants' counsel adamantly insisted at this initial hearing that HHS' policy has been unchanged since 1966 and that HHS' current policy did not include any "rule of thumb" that intermediaries should deny home health care benefits to those (otherwise eligible) individuals needing services more than four days per week. After this hearing, seizing on the apparent possibility that this lawsuit arose from their misunderstanding of defendants' policies, plaintiffs proposed the following stipulation:

> The Medicare Act provides for part-time or intermittent skilled nursing and home health aide services. *See* 42 U.S.C. § 1395x(m)(1), (4).
>
> Skilled nursing and home health aide services are covered under Medicare as long as they are part-time in nature, re-

gardless of how many days per week they are medically necessary.

*See* Proposed Stipulated Partial Summary Judgment. Defendants rejected this proposal. It is thus clear to me that defendants have not been forthcoming about their position despite their protestations that they have no policy which would preclude such an interpretation.

Accordingly, based on the foregoing, and after reviewing the parties' briefs and the oral argument, I came to the conclusion that material issues of fact needed to be resolved in order to decide the "part-time or intermittent" care issue. In particular, I found that Defendants' Statement of Genuine Issues set forth crucial factual issues which had to be settled. According to defendants, the following assertions made by plaintiffs were actually disputed issues of fact which were material to resolving plaintiffs' motion for partial summary judgment:

1. That "defendants' policy mandates care in excess of four times per week is to be considered 'daily' care."

2. That "defendants' policy, with a limited exception for short-term services generally of a 2–3 week period, excludes 'daily' care from Medicare home health coverage."

3. That "defendants' policy mandates that a Medicare patient demonstrate a need for part-time *and* intermittent care."

4. That the Appeals Council "has ruled that 'part-time' daily home health aide services are covered without limitation occasioned by defendants' intermittent care policy."

Defendants' Statement of Genuine Issues (filed May 1, 1987); *see also* Plaintiffs' Memorandum in Support of Proposed Findings of Fact and Conclusions of Law at 3–4. Defendants contended that none of these assertions were true. Because these vigorously contested factual issues went right to the heart of plaintiffs' claims, I issued an Order scheduling an evidentiary hearing to consider HHS' policy regarding

"part-time or intermittent" care. *See* Order, November 20, 1987 at 3.[5]

The evidentiary hearing was held on February 3, 1988. The plaintiffs presented six witnesses, including Thomas Hoyer, the Director of the Division of Provider Services Coverage Policy in the Bureau of Eligibility and Reimbursement Coverage in HCFA (and the individual in HHS primarily responsible for the policies at issue). Plaintiffs submitted 29 exhibits into evidence, including the affidavits of several home health care providers. Defendants did not present any witnesses, but they submitted four exhibits, including three excerpts from administrative materials and information regarding the denial of coverage of one of the named plaintiffs (Lorraine Lis). After the hearing, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law. A final oral argument was held on March 31, 1988.

Upon consideration of the full record of this case, including the testimony and exhibits offered at the evidentiary hearing, the post trial briefs and the closing oral argument, I enter the following findings of fact and conclusions of law.

### FINDINGS OF FACT

A. *The Evolution of the Part-time or Intermittent Care Policy*

1. The Medicare Act was enacted by Congress in 1965 to provide eligible elderly and disabled persons access to necessary health services such as the home health care services at issue in this case. Eligible Medicare beneficiaries are entitled to home health care services including "part-time or intermittent" skilled nursing care and "part-time or intermittent" home health aide care. 42 U.S.C. § 1395x(m)(1,4). *See supra*, p. 1490, n. 3. Congress has not changed the governing statutory language since the Act's passage.

2. The only published regulations dealing with home health care essentially track the statutory language by providing for "part-time or intermittent" care. *See* 42 C.F.R. § 409.40 (1987).

3. The bulk of defendants' policy statements regarding the home health care benefit are found in manuals and transmittals. None of these policies has been subject to public notice and comment.

4. The principal home health care manuals are entitled Health Insurance Manual ("HIM")–11 and HIM–13. *See* Hoyer Deposition (Plaintiffs' Exhibit 1) at 13–14. The relevant coverage criteria in these two manuals are essentially the same, and hereafter I will refer solely to HIM–11.

5. The first version of HIM–11 provided that:

> Part-time or intermittent care is usually services for a few hours a day several times a week. Occasionally, service for a full day may be provided for a short period when, because of unusual circumstances, neither the alternative of part-time care nor hospitalization is feasible.

HIM–11 § 205.1, at 14 (1966) (Plaintiff's Exhibit 3); *see also* Defendant's Post-Hearing Brief at 3.

6. In mid–1966, defendants' predecessors proposed regulations for public notice and comment. They provided, in relevant part:

> c. Definition of part-time or intermittent.

> Most patients will require service a few hours a day, several times a week. Some may require longer service on one day than on other days and such adjustments are to be encouraged. Occasionally, service for a full day may need to be provided for a short time when, because of unusual circumstances, neither the alternative or part-time care nor hospitalization is feasible.

---

5. In that Order, I also denied defendants' motion to dismiss, holding that "[t]he individual plaintiffs who are home health care beneficiaries in this case have standing, they present claims that are ripe for adjudication and they need not further exhaust their administrative remedies in order to obtain judicial review in this court." Order, November 20, 1987 at 1. The reasoning for those conclusions, much of which has already been stated verbally during the course of the hearings conducted in this matter, is set forth herein in my conclusions of law.

31 Fed.Reg. 7143, 7145 (May 14, 1966) (proposed to be codified as new 20 C.F.R. § 405.1224(c)) (Plaintiffs' Exhibit 3); *see also* Defendants' Post–Hearing Brief at 3, n. 3. The final regulation provided a substantively similar definition for "part-time or intermittent." 33 Fed.Reg. 12,090, 12,-093 (Aug. 27, 1968) (codified at 20 C.F.R. § 405.1224(c)) (Plaintiffs' Exhibit 4); *see also* Defendants' Post–Hearing Brief at 3, n. 3.

7. HEW deleted this definition of "part-time or intermittent care" from its regulations in 1971. *See* Fed.Reg. 18,696 (Sept. 18, 1971). Defendants have offered no explanation for this action. There are currently no published regulations defining "part-time or intermittent care."

8. In 1968, HEW issued a transmittal which stated that: "Part-time or intermittent home health aide services are defined to permit up to 20 hours of service in each week and up to 4 hours of home health aide care in a day (which may constitute one or more visits)." Plaintiffs' Exhibit 6 (March 29, 1968 letter from Thomas M. Tierney, Director, Bureau of Health Insurance, to Merritt W. Jacoby, Blue Cross Association, setting forth interim operating guideline). An attachment to the "Tierney letter" indicated that the transmittal did not establish limits, but rather, set forth guidelines. According to Tierney, "there are some situations where longer periods of service can be justified." *Id.*

9. In 1975, HEW issued a revised version of HIM–11 which reflected the Tierney letter and other transmittals issued during the late 1960s and early 1970s. It provided, in relevant part, as follows:

206.6 *Part–Time or Intermittent Services.—*

Part-time or intermittent services of professional personnel and home health aides is usually service for a few hours a day several times a week. *Occasionally, more service, i.e., 8 hours may be provided for a limited period when the physician recommends and, when be-*

cause of unusual circumstances, neither the alternative of part-time care nor institutionalization is feasible...

Home health aide visits usually will be provided two or three times a week for several hours. Thus, most agencies average 20 hours or less a week for the Medicare case load. This average reflects the planning and flexibility needed to provide up to 8 hours a day, 5 days a week, for a few very ill patients who need extensive care and have no family member present during the day.

*In recognition of the span of normal practice followed in home care, reimbursement may ordinarily be made for up to 100 hours a month of home health aide service assuming no question exists regarding the coverage status of such services.* By the same token, on an intermittent basis, service for up to 8 hours a day, 5 days a week, may be provided when medically necessary due to unusual circumstances, e.g., the patient has just returned from the hospital and must be oriented, along with his family, to various aspects of home care; the patient's condition is terminal; or he has suffered a relapse.

HIM–11 § 206.6 (Plaintiffs' Exhibit 8) (emphasis added).

10. Hence, prior to 1980, defendants' predecessors imposed no limits on the number of days a week an otherwise eligible beneficiary could receive home health services. *See* Hoyer Testimony, Transcript at 16. For instance, the agency would reimburse a patient for twenty hours of care rendered over the course of a week *even if such care was provided on each of the seven days of the week. See* Hoyer Testimony, Transcript at 29–32; Plaintiffs' Exhibit 6. Such care, although "daily" and therefore not "intermittent," would be eligible for coverage under the "part-time" prong of the statutory provision.[6] On the other hand, services needed more than eight hours per day were considered full-time and not part-time in nature. The cen-

---

**6.** Defendants offered no evidence to counter plaintiffs' reasoned and well-documented reconstruction of the agency's administration of the

"part-time or intermittent care" provision during the 1960s and 1970s.

tral and prevailing theme common to the pre–1980 regulatory statements was to distinguish between full-time care and part-time services.

11. In a May 1981 transmittal, HHS deleted the part of the HIM–11 instruction which stated that "most agencies average 20 hours or less a week for the Medicare case load and that reimbursement could be made for up to 100 hours a month of home health services, since these figures were being erroneously applied in cases where less service was needed." Plaintiffs' Exhibit 9. The 1981 transmittal did not impose any hourly ceilings on services nor did it alter the prior 100 hours of services per month guideline. Rather, it stressed the need to make a case-by-case determination of whether a patient needed certain services. Hoyer Deposition (Plaintiffs' Exhibit 1) at 36–37.

12. In June 1984, HCFA issued a transmittal given nationwide effect which provided that "daily skilled nursing care of an indefinite duration will not be considered to meet the intermittent requirement and such services are not covered under the Medicare home health benefit." Plaintiffs' Exhibit 12. A few months later, defendants instructed all Medicare fiscal intermediaries that "Medicare coverage for daily home health aide services are subject to the same intermittent guidelines as skilled nursing care." See Plaintiffs' Exhibit 13 (Transmittal dated November 20, 1984). The effect of these transmittals was to restrict Medicare coverage of home health services. This was a drastic change from prior requirements.

13. In a November 14, 1986 letter, defendants further significantly restricted coverage of home health services. In that letter, which is the central document of this litigation, Robert Streimer, the Acting Director of the Bureau of Eligibility, Reimbursement and Coverage, responded to questions raised on behalf of all ten region-

al fiscal intermediaries about the concept of "daily" by stating:

> You indicated that whether the term ["daily"] is defined as 5 days or 7 days *makes a tremendous difference* in both whether beneficiaries qualify for home health services and in the nature of the skilled nursing and home health services available to them....
>
> ... we expect that daily would be defined as 5 days per week in most localities.... *We believe that it is appropriate to define "daily" as 5 days per week.* Therefore, care which is ordered 5, 6 or 7 days per week would be considered "daily" care within the context of the Q and A discussion of "intermittent."

"Streimer Letter" to Mary Townsend, Manager, Department of Operations, Blue Cross and Blue Shield Association (Plaintiffs' Exhibit 14). Although in form an informal "transmittal," Mr. Streimer's new interpretation of the term "daily" is in effect a determination of defendants.[7] Moreover, his interpretation represented a marked substantive break with the agency's past understanding and application of this crucial term. The rigid and narrow definition of "daily" set forth by Mr. Streimer is inconsistent with the agency's longstanding interpretation of the home health care benefit and contrary to law and congressional intent.

14. Mr. Hoyer's testimony confirmed and amplified the Streimer letter. *See* Transcript at 18, 35–37. Although his testimony was at times contradictory, when his statements are considered in conjunction with plaintiffs' exhibits, it is clear that plaintiffs' characterization of the agency's policies is accurate. As plaintiffs contended throughout these proceedings, defendants' current policy regarding "part-time and intermittent care" is as follows:

a. Defendants define part-time to include anything less than eight hours of services in any given day regardless of

---

7. The Streimer letter is the controlling regulation on this issue. As noted above, the published regulations do not define either "daily," "part-time" or "intermittent." The home health manual currently in force merely indicates that

home nursing and aide services are "usually" provided for a few hours a day several days a week. HIM–11 § 206.6 (March 1982 version) (Plaintiffs' Exhibit 11); Hoyer Testimony, Transcript at 42–44.

the number of visits in a given day. Hoyer Testimony, Transcript at 18, 35.

b. The agency considers care to be intermittent only if it is not "daily."

c. Since November 14, 1986, the date of the Streimer letter, defendants have defined "daily" to be five, six or seven days a week. Intermittent care is therefore limited to care that is rendered in one, two, three or four days per week. Hoyer Testimony, Transcript at 18–20, 26, 36; Plaintiffs' Exhibit 14 at 2; Plaintiffs' Exhibit 15.

d. Even if the amount of care rendered is only four or five hours per week, if it is administered during five separate days it is not eligible for coverage under defendants' policy. Because such care is "daily" and hence not "intermittent," it is ineligible. Id.[8]

e. Defendants' policy therefore denies Medicare coverage, for instance, to individuals needing five or six hours of care per week if it is needed at the rate of one hour for each of five or six days. In contrast, an individual needing seven hours of care a day for four days per week is eligible for coverage.

The bottom line is that defendants' interpretation of the terms "daily," "part-time" and "intermittent" can result in coverage for people needing as much as 28 hours of care in a week yet deny coverage to a person needing as little as five or six hours of care per week. Hoyer Testimony, Transcript at 14; see also Hoyer Deposition (Plaintiffs' Exhibit 1) at 69–73.

f. Defendants interpret the disjunctive statutory phrase "part-time or intermittent" care as if it were written "part-time and intermittent" care. They only provide coverage if a patient meets both criteria. See Hoyer Testimony, Transcript at 24, 41, 42; see also Deposition of Stanton J. Collins, Jr., Associate Regional Administrator for Health Standards and Quality, Boston Regional Office of HCFA (Plaintiffs' Exhibit 16) at 39–43.

g. Hence, defendants require care to be both part-time (less than eight hours per day) and intermittent (four or less days per week) for individuals to receive the home health care benefit.

15. The administrative standards represented by the Streimer letter and Mr. Hoyer's testimony are significantly more restrictive than the guidelines that prevailed since the program's inception in 1966. Many individuals presently being denied coverage for home health care services would have been covered under the agency's earlier interpretations of the "part-time or intermittent" care requirement.

16. Defendants' current home health care policy conflicts not only with the plain meaning of the statute and Congress' intent to provide part-time home health care coverage for those individuals who did not need to be institutionalized but also with the regulatory standards established in the 1960s and 1970s.

### B. The Application and Consequences of Defendants' New Policy

17. Defendants new part-time or intermittent care policy has the force of law. It binds the fiscal intermediaries who make all initial coverage determinations and reconsideration decisions. While defendants' counsel has characterized HCFA directives to fiscal intermediaries as nonbinding, Mr. Hoyer candidly admitted HCFA's expectation that fiscal intermediaries would follow HCFA transmittals. See e.g. Hoyer Deposition (Plaintiffs' Exhibit 1) at 55. Failure to adhere to agency transmittals could result in the termination of the federal contract under which an intermediary is hired. Hoyer Testimony, Transcript at 48. In practical terms, fiscal intermediaries cannot ignore agency transmittals. Id.

Actual experience indicates that the fiscal intermediaries have followed the policy

---

**8.** Care rendered more than four days per week may be considered to be "intermittent," but only if if is provided for a "finitely predictable period of time." Plaintiffs' Exhibits 12, 13, 15 at 1. Prior to the recent enactment of the Medicare Catastrophic Coverage Act of 1988, defendants permitted coverage for 2–3 weeks. See Plaintiffs' Exhibit 11; Hoyer Testimony, Transcript at 20–21.

outlined in the Streimer letter apparently without deviation. Plaintiffs have submitted into evidence numerous examples of fiscal intermediary denials in conformity with the Streimer letter and the policies outlined by Mr. Hoyer. *See e.g.* Testimony of Edward Dale, Director of Legal Assistance to Medicare Patients, for Connecticut Legal Services, Transcript at 91–92 ("any time a patient required ... five or more days a week of nursing services, part-time nursing services or part-time home health aide services ... they will be uniformly denied on the basis of HCFA's interpretation of the intermittency requirement ..."); *see also* Plaintiffs' Exhibits 18–29 (collecting examples of fiscal intermediary denials of coverage on the basis of the challenged policy; also collecting affidavits from home health care providers attesting to effect of agency's policy; listing numerous concrete individual examples of how the policy has cut off part-time care).

I find that the individual cases of, for instance, Anna Mazzola, Lorraine Lis, Katherine Duggan, and the cases outlined in the affidavits of health care providers, (Plaintiffs' Exhibits 21–29), are credible and provide powerful and conclusive evidence that the Streimer letter and other HHS transmittals have been uniformly applied with the force of law. Those materials present the stories of many individuals who have been denied coverage for plainly part-time home health care because such care was needed more than four days per week. *See e.g.* Affidavit of Ms. Josephine Sienkiewicz, R.N., M.S.N. (Plaintiffs' Exhibit 22). Mr. Sienkiewicz, the Director of Friends Home Health Care, a nonprofit home health agency in New Jersey, discusses the cases of Mr. Harold Galbraith, Ms. Antoinette Roberson, Ms. Helen Fenton and Mr. Stephen Karandovski, among others, all of whom would have been covered under defendants' part-time and intermittent care policy during the 1960s and 1970s, but who have been denied coverage by fiscal intermediaries pursuant to the Streimer letter and other recent transmittals.

The case of one of her patients, Mr. Galbraith, is particularly instructive. He is a paraplegic who has a history of severe skin ulcers and also requires a foley catheter. He requires the services of a home health aide for one hour per day five days a week to supplement his once or twice-weekly skilled nursing care. The aide only spends *five hours* per week helping Mr. Galbraith. With the help of the aide Mr. Galbraith has managed to use a wheelchair and has achieved some independence at his home and has avoided going to an institution. Defendants have denied coverage for the aide services for the stated reason that the services are not part-time or intermittent.

There can be no doubt that such services previously would have been eligible for coverage. Defendants' present policies, typified by the Streimer letter, have foreclosed such coverage.

Despite my request that they search for such evidence, defendants have provided no examples of a fiscal intermediary acting contrary to the challenged policies. I therefore find that various HCFA transmittals, including the Streimer letter and Plaintiffs' Exhibits 12 and 15, function to prohibit fiscal intermediaries from allowing payment for part-time home health care which is needed more than four days a week (for an indefinite term).

18. The evidence indicates that if a Medicare beneficiary appeals the denial of coverage for part-time daily health services to an administrative law judge ("ALJ"), the beneficiary will almost always obtain a favorable ruling from the ALJ. The ALJs almost uniformly conclude that *part-time, daily* home health services are covered by Medicare. Hoyer Testimony, Transcript at 49–50; Dale Testimony, Transcript at 83–87 (reporting "18 for 18" record on such ALJ cases involving the "part-time or intermittent" care requirement); Plaintiffs' Exhibits 18–21, 29 (collecting successful cases).

19. Furthermore, the Appeals Council has ruled that part-time home health services are covered without limitation on how many days per week they are provided. The Appeals Council has therefore construed the relevant statutory provision in direct contravention to defendants' recent

transmittals. *See e.g.,* Dale Testimony, Transcript at 85; Collins Deposition (Plaintiffs' Exhibit 16) at 36–39. Defendants have not altered or apparently even reconsidered their policy since the Appeals Council's rulings. Rather, defendants have blatantly ignored the Appeals Council's ruling and it is clear that without the intervention of this court, defendants will continue to interpret the law according to the Streimer letter and in clear defiance of the administrative adjudications.

20. Defendants' refusal to implement the Appeals Council's interpretation of the "part-time or intermittent" care requirement and their continued adherence to the challenged policies is having a devastating impact on those individuals who are unable, because of their age, infirmities, isolation or other reasons to appeal an adverse claim determination. As Mr. Hoyer admitted, the effect of defendants' refusal to acquiesce in the rulings of either the ALJs or the Appeals Council (or to pay any attention to the havoc being wrought on home health care providers and beneficiaries) is that individuals must continuously appeal to ALJs to obtain their deserved benefits. Those that have insufficient energy or resources to appeal simply fall by the wayside. *See generally* Dale Testimony, Transcript at 83–88.

21. Even for those who are capable of appealing an adverse decision, a victorious appeal does not safeguard a beneficiary from future denials. Defendants do not give prospective effect to ALJ decisions rejecting their "part-time or intermittent" care policy. As a result, many individuals who have successfully appealed an initial denial to an ALJ are needlessly forced to repeat such appeals.[9] The experiences of Anna Mazzola, Lorraine Lis [10] and Katherine Duggan typify this problem. *See e.g.* Plaintiffs' Exhibit 20 (collection of ALJ decisions favorable to Anna Mazzola); *see also* Dale Testimony, Transcript at 83–86 (describing series of successful appeals by Ms. Mazzola followed inevitably by another denial by her fiscal intermediary of coverage for part-time or intermittent services; patient eventually died after her fourth successful appeal—at her death she was owed reimbursement for services for which her family paid because Medicare had refused payment).

22. Defendants' challenged policy has caused irreparable harm to many Medicare beneficiaries. Because defendants are unwilling to provide part-time daily home health services, many people needlessly have been forced to make the cruel choice between foregoing needed care or submitting to institutionalization in a nursing home or hospital. For many of these people, such a choice hurts both them and the public Treasury. Institutionalization of these people in a hospital or nursing home costs substantially more than would cover-

9. During the pendency of such appeals, the individuals are without coverage. Such administrative appeals often take longer than one year. *See generally* Plaintiffs' Exhibits 18–29; Dale Testimony, Transcript at 98–99.

10. Defendants contend Ms. Lis' most recent appeal is not based on their part-time or intermittent care policy. According to defendants, Ms. Lis' "failure to satisfy the part time or intermittent requirement was merely an alternative basis for the denial of benefits." Defendants' Post–Hearing Brief at 5. Consequently, claim defendants, "the policy challenged here did not cause any injury to Ms. Lis because she was otherwise unqualified for the benefits at issue." *Id.*

Ms. Lis is presently conducting her third and fourth appeals of denials based on defendants' construction of the part-time or intermittent requirement. One denial pending on appeal was based solely on the challenged policy. The oth-

er denial pending on appeal was driven primarily by an application of this policy—but was also predicated on the related assertion that the care Ms. Lis receives is not "medically necessary."

Ms. Lis has already twice successfully obtained ALJ reversals of fiscal intermediaries' applications of defendants' part-time or intermittent policy. As defendants apparently concede, the other appeals focussed solely on the challenged policy. She has yet to lose an appeal.

Ms. Lis has incurred extensive harm because of defendants' challenged policy. *See generally* Plaintiffs' Exhibit 19, Dale Testimony, Transcript at 86–93, 101–106. Defendants' contention that she has not suffered such harm because her latest denial was based on more than one ground trivializes her experience with Medicare and the history of her treatment by defendants' agents—the Connecticut fiscal intermediaries.

age of a home health aide—yet such institutionalization is harmful to both the patient and his or her family.[11]

The testimony of the lead plaintiff's 83 year-old husband, Mr. William Duggan,[12] and the corroborating testimony of Ms. Mary Faye Verville, Executive Director of Goldcoast Home Health Services, the non-profit home health care agency that served the Duggans, vividly portrays the irreparable harm that can be caused by defendants' challenged policy. Mrs. Duggan was diagnosed as having Alzheimer's disease and needed skilled nursing care twice a month to service a foley catheter and to care for urinary tract infections. Verville Testimony, Transcript at 126–27. She also needed the help of a home health aide six days a week for an hour and a half a day. *Id.* at 126–28. She received such services beginning in April, 1981. The aide provided personal care, bathing, female hygiene, skin care, range of motion and assistance in getting going for the day after the care had been completed. *Id.* Because Mr. Duggan has cardiac problems, the home health aide was essential. *Id.* Without it, Mrs. Duggan would have had no choice but to enter a nursing home. Duggan Testimony, Transcript at 134–36. With it, she was able to remain at home. *Id.*

Defendants covered the Duggans' home health aide services for six days a week until June 30, 1986. *See* Plaintiffs' Exhibit 18. The Duggans abruptly were denied coverage for the services of their home health aide during the month of July, 1986 because their fiscal intermediary claimed

the care was not "part-time or intermittent" in nature—even though "the actual services received by [the Duggans] ... were similar in nature to those as had been previously rendered" for the past five years. Plaintiffs' Exhibit 18; *see also* Verville Testimony, Transcript at 128. The coverage denial caused the Duggans emotional and financial distress. The denial of coverage for these vital services also would have necessitated the institutionalization of Ms. Duggan, and her concomitant separation from Mr. Duggan, had not a generous benefactor fortunately intervened.[13] The Duggans appealed the denial to an ALJ and prevailed at an administrative hearing—a year later. *See* Plaintiffs' Exhibit 18; Verville Testimony, Transcript at 129–30. Without the intervention of the benefactor, Mrs. Duggan either would have had to forego medically necessary services because she could not afford it, or she would have had to have been institutionalized.[14] Had she foregone medically necessary care, she would have been at risk of adverse medical consequences.

The case of Mrs. Judy Wilson of Binghamton, New York, outlined in the Affidavit of Elaine Petrozello, Reimbursement Coordinator, Twin Tier Home Health, (Plaintiffs' Exhibit 25), corroborates the Duggans' story and provides further insight into the effects of defendants' policy. Mrs. Wilson has a severe degenerative disorder which has left her bedbound. *See* Plaintiffs' Exhibit 25; Plaintiffs' Memorandum in Support of Proposed Findings of Fact and Conclusions of Law at 2. While

---

**11.** Moreover, entry into a nursing home is not a viable option for many members of the proposed plaintiff class. It is obvious that many of our citizens cannot afford to enter a nursing home. Even for those who can afford it, the waiting lists to enter nursing homes are often months and sometimes years long.

**12.** Mr. Duggan testified because his wife, Katherine Duggan, died on July 18, 1987.

**13.** As a result of the Duggans' appearance on a news program about problems confronting the elderly, a gentleman came forth and volunteered to pay for those days of care for which Medicare denied reimbursement. Verville Testimony, Transcript at 128–29.

**14.** Aside from the significant expense institutionalization would have imposed on Medicare, it is plainly evident that it would have cost the Duggans dearly. Mr. and Mrs. Duggan, who "was 61 years married and two months and two days ... [a]ll good ones," Duggan Testimony, Transcript at 133, both would have been irreparably harmed had they lived apart from each other. There is little question that in this respect the Duggans are representative of many families having one or more family members receiving part-time or intermittent home health care. *See also* Plaintiffs' Exhibit 18 (Lorraine Lis); Plaintiffs' Exhibit 19 (Anna Mazzola); Plaintiffs' Exhibits 22–28 (chronicling the stories of several families like the Duggans).

her husband works and her children attend school, she requires the attention of a home health aide. *Id.* She receives care one and a half hours per day, five days a week. *Id.* She has been denied coverage for these 6.5 hours because her home health services are provided more than four days a week. *Id.* Mrs. Wilson has been forced to forego home health services. The home health aides she has been able to pay for out of her own funds are poorly trained and are inadequate to meet her needs. *Id.* She has been and continues to be irreparably harmed by the challenged policy.

In her case, moreover, application of defendants' part-time or intermittent care policy has resulted in the total termination of her benefits because her needs allegedly exceed permissible limits. *Id.* In other words, defendants do not cover four days of services and separately deny the excess; they *totally* deny coverage. At a minimum, even accepting, *arguendo*, the parameters of defendants' challenged policy, Mrs. Wilson should receive coverage for four days of services each week. This plaintiff has been harmed to a degree well beyond the typical irreparable harm that is caused by defendants' policy. The government shall take steps to remedy this situation and must insure that others are not treated in such an inequitable manner. *See also* Plaintiffs' Exhibit 25 (describing case of Ms. Julia Brennan, an 86 year old female with Multiple Sclerosis, who was totally denied home health care coverage for 6.5 hours a week of home health care and cannot afford to finance replacement services).

Plaintiffs therefore have submitted extensive evidence that defendants' policy is having a widespread effect on Medicare beneficiaries who need part-time care more than four days a week. Defendants have submitted nothing to the contrary. I credit Mr. Duggan's testimony.[15] I similarly credit Ms. Verville's testimony. I find the experience of the Duggans, Mrs. Wilson, and the experiences of the other individuals

described in the evidentiary submissions representative of the experience of many other individuals similarly situated. Because of defendants' policy regarding part-time or intermittent care, they have been irreparably harmed. The upshot is that many patients have entered nursing homes and other institutions as an alternative to less costly home care. Testimony of Linda Gilmore, Executive Director, Chaves County Home Health Services, Transcript at 123. Others have overstayed in hospitals. *Id.* Others have foregone necessary care. *Id.* Still others may have given up the fight out of frustration. As a result, the government may have been improperly enriched on the backs of those in society who are the most vulnerable to being overreached.

23. Moreover, the lengthy process of obtaining a fair determination before an ALJ, coupled with defendants' policy of denying prospective effect to ALJ rulings exacerbates the physiological, emotional and financial implications for individuals denied coverage because of defendants' policy.

## C.  *Class Action Findings*

24. There are numerous elderly and disabled beneficiaries living throughout the United States who have been or will be denied Medicare coverage for part-time home health care services required more than four days a week. Dale Testimony, Transcript at 83.

The evidence submitted by plaintiffs resolves beyond any doubt that a large number of people have been denied coverage because of defendants' challenged part-time or intermittent care policy. *See* Plaintiffs' Exhibits 18–29 (discussing numerous cases around the country). Based on their submissions, it is apparent that thousands of people are affected by defendants' policy. Aside from legal arguments that would eradicate the "class," altogether, defendants have not provided me with any-

---

**15.** Mr. Duggan was an impeccably trustworthy and creditable witness. As he himself eloquently stated, "his wife is gone." Duggan Testimony, Transcript at 136. He came to Washington be-

cause of "the millions of other people who need help." *Id.* He had "nothing to gain" by testifying.

thing that would suggest the policy affects a manageable number of people.

25. These people are typically old, infirm or disabled and in need of medically necessary care. *See e.g.* Testimony of Gloria Morris, mother of Medicare beneficiary Anna Mazzola (*see* Plaintiffs' Exhibit 20), Transcript at 109 (Ms. Mazzola is a paraplegic and unable to attend judicial proceedings); Verville Testimony, Transcript at 126 (describing Mrs. Duggan's condition). They are often isolated and without ready access to legal assistance. *Id.* They are usually without the resources or the will to mount independently a "federal case" against HHS, the largest government agency. Because they are scattered throughout the United States, it is impossible for these people to join in this action individually. Dale Testimony, Transcript at 91–92.

26. Defendants have adopted a policy of applying adjudicative rulings only to the individual named parties. Defendants' policy of "nonacquiescence" is articulated in the Home Health Agency Manual:

A policy of the Supreme Court of the United States is unqualifiedly binding and is a precedent for all similar cases. *A decision of a lower Federal Court is binding only for that case.* Although other courts within the territorial jurisdiction of the court rendering the decision may use it as a precedent in similar cases, each case must be filed and an individual court decision made.

HIM–13 § 3788 (Exhibit 1 to Plaintiffs' Motion for Class Certification, filed April 3, 1987).[16]

16. *Cf.* H.Conf.Rep. No. 1039, 98th Cong., 2d Sess. 38 (1984), *reprinted at* 1984 U.S.Code Cong. & Admin.News at 3038, 3096 ("... by refusing to apply circuit court interpretations and by not promptly seeking review by the Supreme Court, the [HHS] Secretary forces beneficiaries to re-litigate the same issue over and over again in the circuit, at substantial expense to both the beneficiaries and the federal government.").

17. The class may include individuals who *will be* denied coverage—were that policy permitted to continue unchanged—as well as those who *have been* denied coverage because of defendants' challenged policy. All of these people will

Hence, Medicare beneficiaries other than the named plaintiffs will be vulnerable to continued irreparable harm if a class is not certified.

## CONCLUSIONS OF LAW

### A. *Class Certification*

The first issue before me is whether to certify a plaintiff class. Plaintiffs have asked me to certify a class "consisting of all persons whose claims to reimbursement under Medicare have been or will be denied by defendants or their agents on the ground that the provided services did not constitute part-time and/or intermittent care." *See* Proposed Order attached to Plaintiffs' Motion for Class Certification. Certification of a class generally along the lines requested by plaintiffs is appropriate.[17]

■ The plaintiffs certainly satisfy the three requirements for class certification pursuant to Fed.R.Civ.P. 23(b)(2). First, joinder of all class members would be impracticable. Secondly, the individual claims are sufficiently similar to make a class action appropriate. Thirdly, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ..." Fed.R.Civ.P. 23(b)(2). Indeed, the actions by HHS in the cases presented to me has been reprehensible. It is the most blatant form of stonewalling that an agency can engage in and the Secretary should

present their claim to the Secretary—and hence will meet the jurisdictional "presentment" requirements of Section 405(g) *before* becoming a member of the class. They therefore satisfy the requirements of *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 2023, 80 L.Ed.2d 622 (1984) ("claim for benefits shall have been presented to the Secretary") (quoting *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976)). *See also Fox v. Bowen,* CCH Medicare–Medicaid Guide, ¶ 35,374, (Opinion) ¶ 36,030 (Order) (D.Conn.1986) (Cabranes, J.) (providing extensive prospective relief). This case must stand, once and for all, for what the "part-time or intermittent care" provision means.

certainly take all steps to prevent this from happening again.

### 1. Joinder of all Plaintiffs Would be Impracticable

The evidence submitted by plaintiffs reveals that individuals who have been denied coverage because of defendants' challenged policy are widely dispersed and numerous. *See generally* Plaintiffs' Exhibits 18–29; Findings of Fact ¶¶ 17–26 (describing dozens of individuals affected by defendants' policy).[18] The numerosity requirement is plainly satisfied.

### 2. The Claims Raised Are Sufficiently Similar to Make a Class Action an Efficient Litigation Mechanism

Fed.R.Civ.P. 23 also requires that: there be questions of law or fact common to the class; that the claims of the class representatives be typical of the claims of the class; and that the representative parties will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23(a). A shorthand way of combining these three requirements is to ask whether a class action would serve as an efficient method of litigating the issues in the case. *See McCarthy v. Kleindienst,* 741 F.2d 1406, 1410–11 (D.C.Cir.1984) (citing *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982).

A common question of law, namely the procedural and substantive legality of defendants' part-time or intermittent care policy, is shared by all those denied care by defendants' challenged policy. All affected individuals share a common interest in having the policy invalidated and halting harmful denials of home health care benefits that are inconsistent with statutory law and HHS' mandate. The named plaintiffs and those who have been discussed in their exhibits as representative of the class are both typical and capable of adequately representing the interests of the class.[19] The issues raised are discrete and narrow and require no development of a factual record for any given patient, and thus are particularly well suited for determination by a class action. Defendants' opposition to class certification is largely irrelevant to the core issues at stake here. Defendants contend that because each plaintiff requires an individualized administrative review before he or she can obtain a reversal of a denial of benefits, their claims are insufficiently similar to make a class action appropriate. Defendants misconstrue the focus of plaintiffs' claims. Plaintiffs do not seek the reversal of individual benefit determinations. Rather, plaintiffs are attacking the legitimacy of the underlying policy. They are attacking the unwillingness or inability of defendants to scrap a policy contrary to law that has been determined to be so in numerous individual case adjudications. Indeed, it is only through the vehicle of a class action that meaningful relief can be obtained by those needy and elderly citizens who can hardly any longer stand up to the defendant's insensitive and improper tactics.

Judge Jackson of this court recently ordered class certification in a similar HHS case involving a class of plaintiffs seeking a nationwide policy change rather than the

---

18. The "hard" evidence, which alone is enough to satisfy Rule 23's numerosity requirement, is also supported by the soft "numbers." Over 30 million people are enrolled in the Medicare program—of which over 1.6 million submitted claims for home health services in 1986. *See generally* HCFA Bureau of Data Management and Services (1986). In turn, approximately seven percent of those claims were denied. *Id.* Therefore, over 100,000 individuals have been denied home health care benefits in the past calendar year. Although there are no statistics available to fix accurately the percentage of those denials who were denied Medicare reimbursement on the basis that the care they received was not part-time and/or intermittent, the number of such people certainly is in the hundreds and may be in the thousands.

19. Numerous interested individuals have appeared before me or have been featured in materials submitted as evidence during the course of this litigation. They have been united in their desire to put an end to defendants' part-time or intermittent care policy. The individuals, although they suffer from a variety of maladies and have wide-ranging medical needs, share the common goal of obtaining coverage for part-time home health care for services provided more than four days per week.

award of benefits to each individual. His analysis is directly applicable here:

> There can be no doubt that these cases present common questions of law, appropriately handled in the context of a class action ... plaintiff ... does not request an adjudication of individual class members' entitlement to benefits. Rather she seeks only a determination of the validity of certain administrative regulations and policies which themselves determine eligibility when applied to specific cases. As a result, factual variations are of minimal importance, the class claim being controlled solely by common questions of law.

*Pratt v. Heckler*, 629 F.Supp. 1496, 1503, *reconsideration denied sub nom. Pratt v. Bowen*, 642 F.Supp. 883, 885–87 (D.D.C. 1986).[20]

Plaintiffs' concerns can be addressed without dealing with the specific merits of any one plaintiff's case—except insofar as that plaintiff's case represents evidence of an unlawful pattern or practice of the agency. Alleged factual differences in plaintiffs' claims are therefore irrelevant. Plaintiffs' shared interest in eliminating HHS policies that are contrary to law is sufficient for class certification.[21]

### 3. HHS' Actions Affect the Entire Class

I find that HHS "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *See* Fed.R.Civ.P. 23(b)(2). Plaintiffs are complaining about HHS' conduct across the entire nation. Relief for an individual plaintiff or a group of plaintiffs would not serve to help other individuals not part of this court action.

Defendants' strenuous objections to class certification in this case, combined with defendants' repeated contention that this court only has jurisdiction over those individual plaintiffs who have exhausted their administrative remedies, makes me concerned that defendants will not alter their underlying policies unless I certify a nationwide class. This concern is exacerbated by defendants' policy of "non-acquiescence," which condemns worthy plaintiffs to litigate the same issues again and again.[22] Home health care benefits must

---

**20.** In fact, even if this court had the authority to reverse agency decisions regarding the named plaintiffs before it—that would not provide complete relief even to those individuals. It would do nothing to address the harm incurred by the initial denial of reimbursement itself, it would do nothing to compensate those individuals who were forced to do without needed home health care while their appeals were pending, and it would not alter the potential for additional initial denials in the future (should HHS' underlying policies and processes continue unchanged).

**21.** Defendants, relying on *Califano v. Yamasaki*, 442 U.S. 682, 698–702, 99 S.Ct. 2545, 2556–58, 61 L.Ed.2d 176 (1979), also contend that "there is a strong presumption against the certification of nationwide classes"—and that plaintiffs have failed to overcome that presumption. *See* Defendants' Opposition to Plaintiffs' Motion for Class Certification at 9. *Yamasaki*, however, involved the affirmation, not the reversal, of nationwide class certification for a class of plaintiffs challenging the administration of a national program. Nowhere in *Yamasaki* do I find the "strong presumption" to which defendants refer. In this case, as in *Yamasaki*, I find that the denial of class certification is likely to lead to repetitious litigation. As the Court stated:

> ... class relief for claims such as those presented by respondents in this case is peculiarly appropriate. The issues involved are common to the class as a whole. They turn on questions of law applicable in the same manner to each member of the class ... It is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue. And the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every social security beneficiary to be litigated in an economical fashion under Rule 23.

*Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).

**22.** *See generally* Findings of Fact ¶ 26. I have had first-hand experience with HHS' policy of non-acquiescence. *See Home Health Care, Inc. v. Bowen*, 639 F.Supp. 1124 (D.D.C.1986) (HHS refused to vacate invalid transmittal despite my order). *See also Stieberger v. Heckler*, 615 F.Supp. 1315, 1353 (S.D.N.Y.1985) *injunction vacated on other grounds*, 801 F.2d 29 (2d Cir. 1986) (criticizing HHS' nonacquiescence policy).

go to all eligible patients—not just those with inexhaustible intestinal fortitude.

In fact, this case presents compelling special reasons beyond judicial efficiency for certifying a plaintiff class. These plaintiffs are elderly and sick Medicare patients. *See* Findings of Fact ¶¶ 17–26. Many of them are dependent on the receipt of Medicare home health benefits to obtain necessary medical care. *Id.* Plaintiffs' age and infirmities, make them particularly vulnerable to errors in the administrative process. *Id.* An erroneous determination that a patient's home health care is not eligible for reimbursement will often have a devastating psychological and physical impact on an aged, sick and poor patient. *Id.* Many of the patients who are initially denied Medicare reimbursement by a financial intermediary lack the tenacity, finances and energy to pursue an appeal through the administrative process. *Id.; see* Complaint at ¶ 17 ("... many beneficiaries, for reasons of age, health, fear or unawareness of their legal rights, cannot appeal from these initial denials.").[23] The individual's right to an administrative appeal is not a cure-all for what plaintiffs claim ails defendants' part-time or intermittent care policy.[24]

For the foregoing reasons, I certify a nationwide *class* "consisting of all persons whose claims to reimbursement under Medicare for home health care services have been or will be denied by defendants or their agents based on defendants' unlawful 'part-time or intermittent care' policy interpretation." In addition, I reserve the right to amend the definition of the class—and to add additional classes or subclasses—if the "wrongful delegation" aspect of this litigation develops.

**23.** In this regard, this case is closely analogous to *City of New York v. Heckler,* 578 F.Supp. 1109, 1115 (E.D.N.Y.1984) (Weinstein, J.), *aff'd* 742 F.2d 729 (2d Cir.1984), *aff'd sub. nom. Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

**24.** Defendants claim that because several of the named plaintiffs either have obtained or will obtain reversals of initial denials at a later stage in the administrative process the process is functioning satisfactorily. To the contrary, the

## B. *Jurisdiction*

This court has jurisdiction pursuant to 42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1395ff. Section 405(g) provides:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides ...

Section 405(g) is a jurisdictional provision that is not only incorporated into the Medicare Act but also plays a prominent role in the administration of the Social Security Act. In finding jurisdiction pursuant to Section 405(g), I rely primarily on the Supreme Court's recent and definitive interpretation of that section in *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

In *Bowen v. City of New York,* which involved a class action against the Social Security Administration ("SSA"), the Court interpreted the "final decision" requirement of Section 405(g) to consist of two separate elements: (i) the "jurisdictional," non-waivable requirement that a claim for benefits has been presented to the Secretary; and (ii) the "waivable" requirement that the plaintiff exhaust his or her administrative remedies. *Id.* 106 S.Ct. at 2031. *See also Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 899–900, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975).

high reversal rate only underscores the problems with defendants' policy. An agency cannot be permitted to insulate itself from judicial review of what happens to applicants at an early stage of an administrative process simply by permitting the vast majority of persistent, strong-willed beneficiaries to eventually prevail before they exhaust their administrative remedies. *See Stieberger v. Heckler,* 615 F.Supp. 1315, 1353 (S.D.N.Y.1985) *injunction vacated on other grounds,* 801 F.2d 29 (2d Cir.1986).

Defendants do not contest that plaintiffs have satisfied the first, non-waivable, "jurisdictional" aspect of Section 405(g). The named plaintiffs in this case, as well as those individuals cited as examples by plaintiffs, *see* Plaintiffs' Exhibits 18–29, have all presented their claims for benefits to HHS and had them denied by the Secretary. In addition, the plaintiff class in this action is defined in a manner that requires each and every member of the class to satisfy the presentment requirement simply to belong to the class. All class members either have had a benefit claim denied or will have had a benefit claim denied if defendants are permitted to continue their challenged policy.[25]

■ Rather, defendants focus on the second, "waivable" requirement of Section 405(g) that plaintiffs exhaust their administrative remedies. The Supreme Court has adopted an "intensely practical" approach to Section 405(g)'s exhaustion requirement. According to the Court:

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Bowen v. City of New York,* 106 S.Ct. at 2032, *quoting Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 2467, 45 L.Ed.2d

522 (1975). The Secretary argues that plaintiffs have not yet exhausted their remedies.[26] My review of the caselaw and the unique factual circumstances presented in this case, however, has led me to the inexorable conclusion that plaintiffs *have,* in practical terms, exhausted the remedies offered by HHS' administrative process and have received a final decision from the Secretary. Because the Secretary refuses to adjust his policy in light of repeated adverse administrative rulings, there is simply no administrative mechanism to address the underlying faulty definition of "part-time or intermittent care." As a result, plaintiffs cannot obtain what they are initially entitled to receive from the fiscal intermediaries even if they succeed on their appeals. Secondly, an individual plaintiff can never obtain judicial review of the challenged policy. The policy is relentlessly final; its effects are devastating. Plaintiffs have earned access to this court.

The experience of two named plaintiffs, Lorraine Lis and Katherine Duggan, amply illustrates that plaintiffs "are not using this lawsuit to bypass administrative remedies, but rather to make those remedies meaningful." *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss and in Support of Class Certification and Summary Judgment at 9. Plaintiff Lis has twice before pursued administrative remedies in order to reverse initial coverage denials issued on the basis of HHS' "part-time and intermittent" care policy. *Id.* at 9; *see also* Complaint at 17–18.[27] She is a named

---

**25.** In this regard, this case is an "easier" case than *Bowen v. City of New York,* because that case involved not only plaintiffs who presented claims and had them denied, but also included individuals who had their benefits terminated under SSA's continuing disability review—and who only informally met the presentment requirement by returning a questionnaire to the Social Security Administration. *See City of New York v. Heckler,* 578 F.Supp. 1109, 1117 (E.D.N.Y.1984) (informal presentment sufficient to meet requirements of § 405(g)) *aff'd* 742 F.2d 729 (2d Cir.1984) *aff'd sub. nom. Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *see also Fox v. Bowen, supra,* at n. 2.

**26.** Defendants contend that:

> The requirement of a "final decision" has not been satisfied in this case because plaintiffs have not pressed their claims through all necessary levels of administrative review ... the claimant must complete all four steps of the administrative process, including ALJ and Appeals Council review.

*See* Defendants' Statement of Points and Authorities in Support of Motion to Dismiss at 34.

**27.** According to plaintiffs:

> Plaintiff Lorraine Lis is a 68 year-old resident [who] suffers from multiple sclerosis and is confined to her home. She experiences bowel and bladder problems and requires a foley catheter. Lorraine Lis receives home health services ... in the form of monthly nursing visits to change the catheter and

plaintiff in this case not to bypass the administrative process, but to escape from a seemingly endless cycle of coverage denials and appeals.

Similarly, former plaintiff Duggan, during the course of this litigation, obtained a reversal from an ALJ of an initial denial of coverage by a fiscal intermediary. Plaintiff Duggan, who died five months after this litigation was filed, was an 84 year-old woman who suffered from Alzheimer's Disease, bowel and bladder problems, and required a foley catheter and tube feeding. *See supra,* Findings of Fact ¶ 22. She received skilled nursing care and home health aide services. HHS refused payment for the part-time home health aide care because plaintiff Duggan received those services six days a week (for less than two hours per visit), and thus did not qualify for coverage under HHS' "part-time or intermittent" care rules. Despite that reversal, Mrs. Duggan, were she alive, would now be vulnerable to yet another denial of coverage by a fiscal intermediary—because defendants' underlying policy is unchanged. Numerous other plaintiffs have obtained reversals by ALJs of incorrect initial coverage determinations. *See generally* Findings of Fact ¶¶ 17–26; Plaintiffs' Exhibits 18–29; Complaint ¶¶ 23–39. A sizeable number, like Ms. Lis, have received multiple denials and obtained more than one reversal.

Defendants contend that the experiences of plaintiffs Lis, Duggan, and others, in successfully appealing wrongful denials:

> obviously demonstrate[ ] that the statutorily required administrative procedures which plaintiffs seek to avoid in this law-

> home health aide services for approximately two hours each day to meet her personal care needs.
> While Medicare makes payment for the nursing care, coverage has been denied for the part-time, daily home health aide care. The basis of the coverage denial is that the care provided does not meet the standards set in defendants' intermittent care rule. Plaintiff has been denied Medicare coverage for the same level of care on several occasions. Each time, plaintiff Lis successfully appealed the coverage denial to an administrative law judge. Nevertheless, defendants have failed to amend their policy proclamation to conform to the law.

> suit are perfectly adequate to rectify erroneous denials of benefits by fiscal intermediaries, and largely, if not totally, moots plaintiffs' challenge to defendants' supposed intermittent or part-time care policy ...

*See* Defendants' Response to Plaintiff's Suggestion of Death and Status Update at 2. Defendants' argument stands reality on its head. Plaintiffs' success at obtaining reversals cannot shield or insulate defendants' arbitrary and capricious policy from judicial review. In this sense, this case is analogous to the situation that confronted the Second Circuit in *Jones v. Califano,* 576 F.2d 12 (2d Cir.1978), where the Secretary of HEW refused to alter his regulations despite successive adverse decisions by the Appeals Council. In finding jurisdiction and rejecting the agency's exhaustion argument, the court stated:

> Assuming that the Appeals Council continues to rule in favor of claimants, judicial review could be foreclosed entirely. The SSA could operate indefinitely, as it does now, with two standards of benefit calculation, one for claimants who seek review by the Appeals Council, and one for claimants who do not. By doing nothing the Secretary could effectively evade judicial review for the many claimants who fail to contest the per capita method.

576 F.2d at 19. *See also Mental Health Association v. Heckler,* 720 F.2d 965, 970–71 (8th Cir.1983) (judicial review necessary because procedural problem is not addressed when individual obtains benefits via administrative appeal).[28]

Complaint at ¶ 25.

**28.** Similarly, Judge Weinstein, the district court judge in *Bowen v. City of New York,* drew conclusions in that case that are equally apt here:

> Reversal of an individual decision by an Administrative Law Judge could not alleviate the problem of other members of the class. Reversal would be on the fact of individual disability, not the illegal procedure.... Exhaustion serves no purpose in such a situation.

*City of New York v. Heckler, supra,* 578 F.Supp. at 1118.

The experiences of plaintiffs Duggan, Lis and others are strikingly powerful evidence of the effect of HHS' policy of "internal non-acquiescence." It is remarkably unfair for the fiscal intermediaries that make initial coverage determinations neither to take into account nor to "acquiesce" in decisions made by either an ALJ or the Appeals Council. Because the agency is committed to this policy of internal non-acquiescence, which guts the precedential value of any individual's successful appeal, many plaintiffs are hit with another denial almost immediately after they have succeeded in overturning an earlier coverage denial. Plaintiffs are on a merry-go-round.[29] They have a right to get off.

The Secretary's decision about this matter obviously is final. It is thus clear that the plaintiff class has met the exhaustion requirement in fact as well as law.

In any event, the exhaustion requirement also may be waived. Had plaintiffs not exhausted their administrative remedies in this case, the same reasons that justified dispensing with the formal aspects of exhaustion in *Bowen v. City of New York* would require me to do so in this case. Judicial waiver of the exhaustion requirement is appropriate when further exhaustion would be futile, plaintiffs' legal claims are collateral to their demand for benefits or where the harm suffered pending exhaustion would be irreparable. *See City of New York v. Heckler,* 742 F.2d at 736 (characterizing these bases for judicial waiver of the exhaustion requirement as "futility," "collaterality" and "irreparable harm"). In this case, each of these three factors support waiver.

For the same reasons plaintiffs have already "exhausted" the remedies offered by HHS, it would be an exercise in futility to require them to try still further to formally pursue administrative processes. Moreover, the pattern of regular initial coverage denials followed by victories on appeal, together with the agency's intransigent non-acquiescence, bars, in practical terms, obtaining an individualized formal decision from the Secretary. Plaintiffs are trapped in a yo-yo like cycle. In such circumstances, the miserable condition of the plaintiffs *itself* constitutes the Secretary's "final decision." The administrative process will not solve the recurring problems presented in this case or vindicate the rights asserted by the plaintiff class. Further efforts would be futile.[30]

Plaintiffs' claims also are collateral to their demand for home health care benefits. *See Bowen v. City of New York,* 106 S.Ct. at 2032. Plaintiffs have not asked me to rule on the merits of any individual claim. No plaintiff seeks monetary benefits. Rather, plaintiffs seek a declaration that the definition of "part-time or intermittent" care employed by the Secretary is arbitrary and capricious and was not enacted in accordance with the APA. Even if the plaintiff class succeeds in its challenge to defendants' policy, no individual will receive benefits.[31] In this regard, this case is similar to *Bowen v. City of New York,* where the plaintiffs' challenge to the Secretary's overall policies was found to be "somewhat intertwined" with the claimants' demand for benefits. 742 F.2d at 737. In both cases, although plaintiffs' claims are not "wholly collateral," they are "substantially collateral" to their claim for benefits. *Id.* Plaintiffs' challenge of HHS' part-time or intermittent care" policy presents a legal issue "substantially collateral" to the right of members of the class to receive home health care benefits and consequently meets the standard for waiv-

---

**29.** *See* Statement of Plaintiffs' Counsel, Transcript of Closing Arguments, March 31, 1988, at 5, 9.

**30.** *See e.g.* Hoyer testimony, Transcript at 72–72.

**31.** For instance, a plaintiff who receives a certain medical service in his or her home six days a week will not automatically be provided Medi-

care reimbursement if the class prevails in its challenge of HHS' policy. Rather, such an individual's claim will have to be reopened and re-evaluated by the agency. That person, will, however, not have their claim knocked out as a matter of course at the initial determination phase simply because they receive medical care more than four days per week.

er of the exhaustion requirement.[32]

I also find that the elderly, sick and poor people who make up the plaintiff class surely are suffering irreparable harm and would continue to suffer such harm if needlessly forced to further fight the agency. Coverage denials take away essential medical services from aged and sick people. Many of those who are wrongfully denied coverage are either too old, too sick or too afraid to appeal. *See supra*, Findings of Fact ¶¶ 22–26. The delay between initial denials and ultimate reversals deprives even those with the ability to appeal coverage denials of needed health care during the interim. Claimants must withstand the psychological stress of being vulnerable to a claim denial at any time. Even individuals who have reversed an adverse initial determination have no guarantee that they will not fall prey to another denial of the identical claim at a later date.

The plaintiffs in this case are just as dependent, physically and psychologically, on home health care benefits as the mentally ill patients in *Bowen v. City of New York* were on the payment of their disability benefits. Judge Weinstein's concerns

about the mentally ill are similarly valid in this context:

> Loss of benefits is not the only damage termination causes to a mentally ill person. The ordeal of having to go through the administrative process may trigger a severe medical attack. Many persons have been hospitalized due to the trauma of having disability benefits cut off ... Because of their disability, many members of the class were incapable of challenging the bureaucracy.

*City of New York v. Heckler*, 578 F.Supp. at 1118. It is hard to imagine how either plaintiff Duggan or plaintiff Lis, or others similarly situated, managed to pursue administrative remedies repeatedly while they coped with reduced home health care.[33]

The only effective means of addressing plaintiffs' claims is judicial review.[34]

### C. *Standing, Ripeness and Mootness*

Defendants argue that none of the plaintiffs has standing, that no one has a claim that is ripe for judicial review and that all the issues raised are now moot. None of these arguments has merit. All they amount to is a rehash of defendants' contention that plaintiffs must exhaust their

---

**32.** As Judge Jackson correctly emphasized in *Pratt v. Bowen*, 642 F.Supp. 883 (D.D.C.1986), a case involving a class action against the Social Security Administration pursuant to Section 405(g) which was decided shortly after the Supreme Court decided *Bowen v. City of New York*, the relief sought by the class must *precede* the award of benefits to any individual. Judge Jackson's reasoning and his reliance on *Bowen v. City of New York* is equally appropriate here. He wrote:

> The claims for benefits were collateral to the relief sought, i.e., *the vitiation of an unlawful policy*, and the claimants likely to be irreparably harmed if the exhaustion requirement were insisted upon. Given the system-wide application of the invalid policy of which the plaintiffs were complaining, exhaustion would have been a superfluous formality ... The instant case is ... very similar to *Bowen v. City of New York*, and the formality of exhaustion can as well be dispensed with here. The claims for benefits of the several class members are collateral to—indeed, had to be preceded by—the only relief sought for the class as a whole, viz., the judgment declaring the qualifying regulations invalid and an injunction against their enforcement. . . .

642 F.Supp. at 887.

**33.** That plaintiff Duggan and plaintiff Lis did put their concerns before a federal court is a tribute to their dogged perseverance and the interest shown in them by counsel and the institutional plaintiffs. There are undoubtedly others not before me who have been harmed by the challenged policy but are incapable of effective protest.

**34.** Because I have jurisdiction pursuant to 42 U.S.C. § 405(g), I need not reach plaintiffs' contention that 28 U.S.C. § 1331 offers an alternative basis for jurisdiction. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss and in Support of Class Certification and Partial Summary Judgment at 8, n. 3, 10–11 (arguing that *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 2138–39, 90 L.Ed.2d 623 (1986) permits federal court jurisdiction when challenges levied against agency regulations and procedures extend beyond individual benefit determinations and reach underlying agency methods); *see also Medical Fund–Philadelphia Geriatric Center v. Heckler*, 804 F.2d 33, 38 (3d Cir.1986); *Bowen v. City of New York*, 106 S.Ct. at 2028 n. 9 (28 U.S.C. § 1361).

administrative remedies before obtaining judicial review.

### 1. Standing

■ According to defendants:

> In an obvious attempt to evade Section 405(h), plaintiffs assert that this action "does not seek nor would it result in the award of Medicare benefits." If this is true, however, then those plaintiffs have no personal stake in the outcome of this lawsuit because the relief sought would not redress their injury ...
>
> ... *plaintiffs are faced with an inescapable dilemma:* if they ask for relief that would redress their only cognizable injury, they deprive the Court of jurisdiction; if they request relief that has little likelihood of providing a remedy to aggrieved beneficiaries, they cannot satisfy the constitutional requirements of standing.

Statement of Points and Authorities in Support of Defendants' Motion to Dismiss at 14, 16 (footnote omitted) (emphasis added). *City of New York v. Heckler* provides the answer to plaintiffs' "dilemma"—their challenges to defendants' policy are not "wholly collateral," but are "substantially collateral" to their individual claims for benefits. 742 F.2d 729 at 737, *aff'd sub. nom. Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462

(1986); *see supra* at 1506–1507. Although no individual plaintiff will obtain money damages from this lawsuit, there is a hollow ring to defendants' claims that the individual plaintiffs do not stand to benefit directly from a reform of defendants' policy. Plaintiffs obviously have been seriously harmed by the challenged policy—they will just as obviously be the prime beneficiaries if the policy is reformed. It is not a prerequisite for standing to sue that the goal of the lawsuit be a direct and immediate cash award. In fact, the goal can be wholly non-economic in nature.[35] Success for these plaintiffs will take the form of a long-term "pay-out" from the reform of defendants' part-time or intermittent care policy. That is enough to establish standing.

People like plaintiffs Lorraine Lis and Anna Mazzola, who are seriously harmed by defendants' policy, and have no means to challenge that policy within the agency, cannot simply be consigned forever to ride the merry-go-round. There is no better party to challenge the agency's policy than this class of aggrieved individuals. If defendants are arguing that there is *no* party that can challenge their administrative policies, that argument is rejected. The home health care entitlement cannot be cut with impunity. HHS must be held accountable for its actions. It is not above the law.[36]

---

**35.** Many different sorts of interests are sufficient to support standing. *See e.g. Association of Date Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) ("aesthetic, conservational and recreational as well as economic values"); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (interest in use of natural resources).

**36.** Defendants also argue that the three state and private home health agency plaintiffs and the National Association for Home Care ("NAHC"), are without standing to sue. *See generally* Statement of Points and Authorities in Support of Motion to Dismiss at 16–20. Likewise, they contest the standing of the congressional plaintiffs. Because the individual plaintiffs have standing, I need not reach these issues.

However, regarding the home health agencies, I note that the usual bases for organizational standing would appear to be present in this case. *See generally Havens Realty Corp. v. Cole-*

*man,* 455 U.S. 363, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 936–938 (D.C. Cir.1986). According to plaintiffs, the part-time or intermittent care policy has impaired the ability of the home health agencies to perform their core functions and has required them to devote significant resources to coping with the policy. *See e.g.* Complaint at ¶ 4.

The home health agencies are placed in a very awkward postition by defendants' restrictive policy. Apparently, the home health agencies often finance home health care even through a fiscal intermediary has denied coverage. In so doing, they "bet" that the individual—who usually cannot finance his or her own home health care—will win his or her appeal. On the other hand, if the agencies decide that the beneficiary will lose his or her appeal, and deny coverage during the pendency of that appeal, they are party to a wrongful denial of coverage if that person eventually prevails.

The home health agency plaintiffs in this case, therefore, are in a position somewhat analogous

### 2. Ripeness and Mootness

■ Defendants also argue that plaintiffs' claims are not ripe for judicial review because further administrative proceedings are necessary to develop the facts. According to defendants, "plaintiffs have alleged no present, direct and immediate injury which would warrant judicial review ..." Statement of Points and Authorities in Support of Defendants' Motion to Dismiss at 37. For the same reasons that these arguments were without merit in the context of the exhaustion inquiry, they are deficient as ripeness concerns. The legal standards governing ripeness and exhaustion are similar. *Compare Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 434 (D.C.Cir. 1986) (ripeness inquiry turns on "practical common sense approach" that considers fitness of issues for judicial resolution and hardship to the parties of withholding court consideration) *with Bowen v. City of New York, supra,* 106 S.Ct. at 2032 (exhaustion doctrine requires "intensely practical" consideration of whether further administrative proceedings would aid judicial resolution of issues and impact of such proceedings on claimants). *See also Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

As discussed above, without the acquiescence of the leadership of HHS, the agency's administrative process is incapable of providing the relief sought by plaintiffs. HHS' policy is final. Further processing of individual cases would serve no purpose but to cause plaintiffs further irreparable harm. This case is ripe.

■ Defendants have also argued that individual successes in obtaining ALJ reversals of fiscal intermediaries' denials of coverage moots this litigation. Defendants

make the macabre suggestion that Lorraine Lis' successful pursuit of her third appeal and Katherine Duggan's success on her administrative appeal only five months prior to her death "largely if not totally, moots plaintiffs' challenge to defendants' supposed intermittent or part-time care policy." Defendants' Response to Plaintiffs' Suggestion of Death and Status Update at 2. According to defendants, such developments demonstrate the adequacy of the administrative procedures to address plaintiffs' complaints. This argument has already been dealt with in the context of defendants' exhaustion defense. *See supra* at 1505–1509. Plaintiffs are entitled to a fair and accurate initial determination from the fiscal intermediaries. They should not regularly be put to the tedious task of appealing to ALJs to overturn erroneous coverage determinations.[37] Because defendants have persisted in enforcing an unlawful definition of part-time and intermittent care, *see generally* Plaintiffs' Exhibits 18–29, this controversy is very much alive.

### D. The Standard of Judicial Review

A court reviewing agency action pursuant to the Administrative Procedure Act ("APA") must "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### E. The Merits of Defendants' Policy

■ Plaintiffs contend that defendants' policy is both inconsistent with the Medicare Act and is arbitrary and capricious.

to the position in which Qualified Designate Entities ("QDEs") found themselves in *Ayuda v. Meese,* 687 F.Supp. 650, 654–660 (D.D.C.1988). In both cases, organizational plaintiffs were placed in a conflicted position by an agency policy—and in both cases, a clear and correct declaration of the policy was necessary to end that conflict.

**37.** *See e.g. Jones v. Califano, supra,* 576 F.2d at 19–20, where the court, confronted with an analogous situation, stated:

By declining to alter his regulations in spite of successive decisions by the Appeals Council, the Secretary is forcing claimants to proceed by the tedious method of adjudicating their claims on an individual basis, even though eligibility is conceded ... if we were to hold that the District Court lacks jurisdiction, the Secretary would be permitted to require each individual separately to exhaust his administrative remedies.

### 1. Defendants' Policy is Inconsistent With The Medicare Act

#### a. The Policy is Contrary to the Plain Meaning of the Act and the Legislative History

As discussed above, *see supra* pp. 1490–1491, the Medicare Act establishes certain eligibility conditions that a beneficiary must meet to receive home health care coverage. The beneficiary must be confined to his or her home; must be under the care of a physician; and must need intermittent skilled nursing care or certain types of physical, speech and occupational therapy. *See* 42 U.S.C. § 1395f(a)(2)(C). The care must also be medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). An individual satisfying those eligibility requirements qualifies for "part-time or intermittent" nursing care and the "part-time or intermittent" care of a home health aide. 42 U.S.C. § 1395x(m)(1) and (4).[38]

The legislative history indicates that Congress intended the "part-time or intermittent" home health care provision to entitle Medicare beneficiaries to receive care at home as long as they do not require full-time care:

> The proposed post-hospital home health payment would meet the cost of part-time or intermittent nursing services, physical, occupational and speech therapy and other related home health services furnished by visiting nurse agencies, hospital based home health programs and similar agencies. *More or less full-time nursing care would not be paid for under the home health benefits provision.*

S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong.

& Ad.News 1943, 1974 (emphasis added). Hence, as defendants admit, "the 'part-time or intermittent' requirement in the statute distinguishes those patients who are suitable for treatment at home from those who more appropriately could be treated in an institution." *See* Defendants' Statement of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment at 17.

In contrast, defendants' challenged policy limits "part-time or intermittent" care coverage to four days per week. *See supra* Findings of Fact ¶¶ 13–14. Defendants also require beneficiaries to show services were both part-time *and* intermittent in order to obtain reimbursement. *See supra,* Findings of Fact ¶¶ 13–14; *see also* Plaintiffs' Exhibit 16 at 39–43. In other words, if home health services are needed more than four days per week, even if they are only needed part-time, the beneficiary is denied coverage. *Id.* These policies directly contravene both the plain meaning of the statute and the expressed intent of the legislature that only full time care be excluded.

Similarly, defendants' substitution of the word "and" for the word "or" in their application of the term "part-time or intermittent" departs significantly from the plain meaning of the words used by Congress. The statute and the legislative history indicate Congress intended to entitle beneficiaries to coverage if care is needed *either* part-time (*i.e.* less than eight hours per day) *or* on an intermittent basis (*i.e.* less than daily). Requiring beneficiaries to meet both requirements rather than only one substantially disrupts the statutory scheme established by Congress.[39]

---

**38.** Plaintiffs do not take issue with defendants' application of the initial eligibility requirements. Rather, plaintiffs challenge defendants' interpretation of the "part-time or intermittent" care appropriately accorded individuals who meet the eligibility requirements set forth in 42 U.S.C. §§ 1395f(a)(2)(C) and 1395y(a)(1)(A). *See e.g.* Dale Testimony, Transcript at 96 (explaining difference between threshold eligibility requirements and limits on care received once satisfy requirements); Plaintiffs' Proposed Factual Findings and Legal Conclusions at ¶ 18B (relief requested only for persons "otherwise

eligible" for home health care); Transcript of March 31, 1988 Closing Arguments at 5–6.

**39.** 42 U.S.C. § 1395x(m)(1, 4) is written in the disjunctive. It must be applied in the disjunctive unless such a reading "would be demonstrably at odds with the will of Congress." *Unification Church v. INS,* 762 F.2d 1077, 1084 (D.C.Cir. 1985); *see also Reiter v. Sonotone,* 442 U.S. 330, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates other-

The result of defendants' definition of "daily" as five days or more per week, combined with their requirement that beneficiaries satisfy both the "part-time" and the "intermittent" prong of the "part-time *or* intermittent" care requirement, is that individuals such as Ms. Lis and Mrs. Duggan, who satisfy the part-time requirement because they need only one or two hours of care each day, are denied coverage. Because neither Ms. Lis nor the other named plaintiffs need full-time care, yet are denied home health care coverage pursuant to defendants' challenged policy, the policy is contrary to the plain meaning of the statute.

### b. Subsequent Legislation

#### 1. The 1980 Act

In 1980, Congress reaffirmed its intent that home health care be a preferred alternative to institutional care when it removed yearly limitations on the permissible number of home health care visits. Originally, a home health care beneficiary could receive a maximum of 100 visits per spell of illness under Medicare Part A and 100 visits per calendar year under Medicare Part B. As part of the Omnibus Budget Reconciliation Act of 1980, Congress expanded home health care coverage by lifting the statutory limitation and permitting an unlimited number of part-time or intermittent home health care visits. *See* Pub.L. No. 96–499, § 930(b) and (g), 94 Stat. 2599, 2631 (1980) (amending 42 U.S.C. §§ 1395d(a)(3) and 1395k(a)(2)(A)). This expansion of home health care coverage supports plaintiffs' contention that defendants' coverage cutbacks during this decade are contrary to expressed Congressional intent that such coverage increase.

#### 2. The Medicare Catastrophic Coverage Act of 1988

Defendants have contended throughout this litigation that various legislative bills, particularly H.R. 2470, the prime precursor of the Medicare Catastrophic Coverage Act of 1988, "support defendants' interpreta-

tion of the scope of intermittent or part-time care and may moot plaintiffs' challenge to defendants' policy entirely." *See* Defendants' Notice of Recent Developments at 2; *see also* Defendants' Post Hearing Brief at 19; Defendants' Supplemental Notice of Recent Developments at 1 (reprinting legislation and portions of House floor debate). According to plaintiffs, in contrast, the 1988 Act expands home health care coverage and hence supports their view that defendants' restrictive policy is contrary to Congressional intent. *See generally* Plaintiffs' Response to Defendant's Supplemental Notice of Recent Developments (reprinting segment of Senate floor debate).

Because the effective date of the legislation is January 1, 1990, and the Act is not to be applied retroactively, the Act does not directly affect the issues in this case. It certainly does not moot this case. *See e.g.* Hoyer Testimony, Transcript at 66.

Nevertheless, the parties both contend that the legislation and the attendant legislative history are instructive about the issues I must determine. The legislation at issue amends 42 U.S.C. § 1395x(m) by adding at the end the following new sentence:

> For purposes of paragraphs (1) and (4) and sections 1814(a)(2)(C) and 1835(a)(2)(A), *nursing care and home health aide services shall be considered to be provided or needed on an "intermittent" basis if they are provided or needed less than 7 days each week* and, in the case they are provided for 7 days each week, if they are provided or needed for a period of up to 38 consecutive days.

*See* 134 Cong.Rec. H3779 daily ed. June 1, 1988) (House of Representatives passage of H.R. 2470) (reprint of Section 206, "Extending Home Health Services") (emphasis added). Defendants contend that this amendment supports their restriction of "part-time or intermittent" care to four days a week, their definition of "daily" to mean five days a week, and their view that "part-

---

wise ...."). Here, reading the word "or" in its usual disjunctive connotation furthers Congress' intent of excluding *only* "[m]ore or less full-time

nursing care" from home health coverage. S.Rep. No. 404, 89th Cong., 1st Sess. (1965), 1965 U.S.Code Cong. & Ad.News 1974.

time or intermittent" should be interpreted to mean "part-time and intermittent." *See generally* Defendants' Supplemental Notice of Recent Developments. I do not find any basis for support of defendants' policy in the plain language of this amendment.

Rather, the amendment addresses only the "intermittent" prong of the "part-time or intermittent" requirement.[40] It therefore left intact the part-time prong for obtaining home health care—and left unresolved the controversy in this case regarding whether the key phrase should be interpreted as "part-time *or* intermittent" or "part-time *and* intermittent." [41]

Moreover, in amending the "intermittent" prong, Congress plainly expressed its desire to permit beneficiaries to obtain realistic home health care coverage by permitting intermittent care to be provided without any limit on the number of days per year if such care is provided less than 7 days each week. Congress therefore defined "daily" to mean seven days per week —and rejected HHS' current working definition of five days per week.[42]

In sum, the new legislation prospectively defined with a much-needed degree of precision home health care benefits. In so doing, Congress treated "part-time or intermittent" care in a manner consistent with plaintiffs' understanding of the concept and in a manner wholly at odds with defendants' challenged policy.

### 2. Defendants' Policy is Arbitrary and Capricious

Defendants' policy is arbitrary and capricious. First, application of the policy produces absurd results. For example, a beneficiary needing a total of five hours of

---

**40.** The statutory language used plainly indicates Congress' intent to amend only the "intermittent" aspect of the "part-time or intermittent" requirement. This straightforward interpretation of the statute, which defendants contest, is confirmed by the following exchange on the Senate floor between Senator Bentsen, the chairman of the Finance Committee and the floor manager for the Act, and Senator Bradley, a member of the Finance Committee and the House–Senate Conference Committee which reported the legislation, and a principal participant in the passage of the Act:

> **Mr. Bradley.** Mr. President, I am especially pleased that the bill before us expands *daily* home care to 38 days and longer when unusual circumstances exist. I would like to engage in a short colloquy with the chairman of the Finance Committee to discuss the intent of the provision. It is my understanding that exceptional circumstances currently exist where a patient's medical needs can safely and effectively be met in a home setting, thereby making institutional care unnecessary and inappropriate. Further, where institutional care may be necessary, but cannot be immediately arranged, extended payments are to be made. It is my assumption that no changes are made in these policies. *Finally, it is my understanding that the daily care and intermittent care provisions in the bill are not intended to define Medicare limits on part-time home health care services as set forth in section 1861m.*
>
> I wanted to determine if this is the understanding of the chairman of the Senate Finance Committee as well.
>
> **Mr. Bentsen.** Mr. President, it is the clear intent of this legislation that daily home health benefits be expanded. It is my under-

standing that current exceptional circumstance policies would remain in effect and that *this bill does not in any way affect the current definition of part-time home care.*
134 Cong.Rec. S7261 (daily ed. June 7, 1988) (emphasis added).

These remarks by key legislators "are an authoritative guide to the statute's construction," *North Haven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982), and "deserv[e] to be accorded substantial weight." *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976). That is particularly the case here because the Senators' statements "are consistent with the statutory language and other legislative history." *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 1840, 90 L.Ed.2d 248 (1986).

**41.** However, the exchange between Senators Bentsen and Bradley, *see supra,* n. 40, in which they discuss one part of the requirement, namely the intermittent prong, explicitly acknowledges the two-pronged nature of the test and reflects Congress' understanding that the dual concept of "part-time or intermittent" consists of two separate parts—and hence two bases for receiving care.

**42.** The amendment also permits otherwise eligible beneficiaries to receive up to 38 consecutive days of *daily* home health care pursuant to the "intermittent" prong of the provision—which is an expansion of HHS' current limitation of such daily care to 2–3 weeks. *See generally* Defendants' Supplemental Notice of Recent Developments at 2, n. 2 (collecting statements by members of Congress that Section 206 expands home health care coverage).

care per week is denied coverage if the care is needed over the course of five or more days, while a person needing as many as 27 hours of care spread over only four days may qualify for coverage. *See supra,* Findings of Fact ¶¶ 13–14; Hoyer Testimony, Transcript at 14. Second, the definition of "daily" to mean more than four days per week is without basis in reality. Merely because the "business week" is made up of five days does not mean that home health care needed five days a week is needed on a "daily" basis. *See* Hoyer Testimony, Transcript at 15 ("our notion of daily has followed, in effect, the business week, rather than the calendar week"). It is simply not the "business" of these plaintiffs to be sick and infirm. The yardstick chosen by the agency to define "daily" is inappropriate for the context in which the term must be applied. Home health care beneficiaries must survive seven days a week—their medical needs do not take weekends off. For these people, as Congress confirmed in the recently enacted Medicare Catastrophic Coverage Act of 1988, "daily" means seven days a week—anything less is *not* daily. HHS, in fact, in the context of defining "daily" as requirement for admission to a skilled nursing facility, considers "daily" to mean "7 days a week." *See* 42 C.F.R. § 409.34(a)(1) (1987). It is hard to understand how defendants can consider "daily" to mean 7 days a week when the term functions as an entrance requirement to a skilled nursing facility while in this context, where it functions to exclude a person from coverage, it is defined as 5 days a week.

### 3. Defendants Failed to Comply With the Notice and Comment Requirements of the APA When Adopting the Challenged Policy

■ The holding in this case is that defendants' policy is contrary to law and arbitrary and capricious. This really ends the issue. It should be noted, however, that even if the defendants had the authority to change the policy the way that they did, they did not act in compliance with the Administrative Procedure Act ("APA"). The Streimer letter, barring coverage for services rendered more than four days a week, and defendants' conversion of the "part-time or intermittent" requirement to a "part-time *and* intermittent" requirement effected material changes.[43] As such, these changes constitute a new rule.[44] The promulgation of a "rule" requires adherence to the notice-and-comment procedures of the APA, which were not followed in this case.

### CONCLUSION

For the foregoing reasons, defendants' challenged policy was promulgated unlawfully and constitutes arbitrary and capri-

---

**43.** *See supra* Findings of Fact ¶¶ 1–16 (tracing transformation of defendants' policy from its inception in 1966 to the present).

**44.** *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ..."); *see also Center for Auto Safety v. NHTSA,* 710 F.2d 842, 846 (D.C.Cir. 1983) (APA definition of rule "is broad enough to include nearly every statement an agency may make").

The challenged policy creates new law and is not merely interpretative of existing law. It is therefore not exempt from APA procedures. *Gibson Wine v. Snyder,* 194 F.2d 329, 331 (D.C. Cir.1952) ("... 'regulations,' 'substantive rules' or 'legislative rules' are those which *create law,* usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means .." (emphasis added).

*See also American Hospital Association v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987); *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982); *Batterton v. Marshall,* 648 F.2d 694, 704–5 (D.C.Cir. 1980).

Fiscal intermediaries are bound by defendants' policy—if home health care providers deviate from the policy they take considerable financial risk. Defendants' policy therefore has the force of law. It prospectively determines coverage determinations. *See American Bus Association v. United States,* 627 F.2d 525, 529–30 (D.C.Cir.1980) (rule that effectively circumscribes administrative discretion and is determinative of issues or rights to which it is addressed is binding and not mere "general statement of policy"). Moreover, defendants' usage of an informal transmittal to adopt the challenged policy does not effect the policy's binding quality. *See e.g. American Hospital Association, supra,* 834 F.2d at 1057 n. 4.

**1515**

cious agency action contrary to the Medicare Act.

### RELIEF

Defendants have interpreted the provision of the statute pertaining to "part-time or intermittent care" in a way that arbitrarily excluded from "part-time or intermittent" coverage part-time care provided to Medicare beneficiaries on more than four days per week.

It is therefore hereby

DECLARED that defendants' "part-time or intermittent" care policy that arbitrarily excluded from its definition part-time care that is needed for more than four days a week is contrary to law, and it is further

DECLARED that home health services that may exceed four days a week and otherwise are eligible for this entitlement satisfy the statutory requirement that they be "part-time or intermittent," 42 U.S.C. § 1395x(m)(1) and (4), regardless of how many days per week they are needed, so long as such care otherwise meets the requirements for part-time or intermittent care coverage, and it is further

DECLARED that defendants' interpretation of the "part-time or intermittent" care provision which requires a person otherwise entitled to receive coverage for home health care on a less than full-time basis to establish that such care is both "part-time and intermittent" is contrary to law and that said persons are entitled to coverage if they establish such services are "part-time" or "intermittent."

Having concluded that numerous people were denied and otherwise would be denied their right to home health coverage based on defendants' policy that was contrary to law, it is hereby

ORDERED that a nationwide class be CERTIFIED "consisting of all persons whose claims to reimbursement under Medicare for home health care services have been or will be denied by defendants or their agents based on defendants' unlawful 'part-time or intermittent' care policy interpretation," and it is hereby further

ORDERED that defendants and their agents are enjoined from denying Medicare coverage for "part-time" services on the basis of defendants' unlawful interpretation of that term, and it is further

ORDERED that defendants and their agents are enjoined from excluding from coverage "part-time" care needed more than four days per week even if such care is provided for an indefinite period, and it is further

ORDERED that defendants and their agents are enjoined from interpreting the "part-time or intermittent" care provision to require a person otherwise entitled to receive coverage for home health care provided on a less than full-time basis to establish that such care is both "part-time and intermittent;" and to permit said persons to receive coverage if they establish such services are "part-time" or "intermittent," and it is further

ORDERED that defendants and their agents identify and reopen all Medicare claims pending or submitted at least since the filing of the Complaint in this action on February 17, 1987 which were denied pursuant to defendants' unlawful policy and process those claims in conformity with the Memorandum Opinion issued this day, and it is further

ORDERED that the Secretary shall report what actions he has taken to correct the abuses that have been detailed in this Opinion and to comply with this Order in thirty days, and it is further

ORDERED that this court shall retain jurisdiction to provide whatever additional relief may be required.