**O'KEEFFE'S, INC., Petitioner,**

**v.**

**U.S. CONSUMER PRODUCT SAFETY COMMISSION, Respondent.**

No. 94–70580.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1996.

Submission Vacated Jan. 16, 1996.

Resubmitted Feb. 9, 1996.

Decided Aug. 13, 1996.

Mark I. Schickman, Fox and Grove, Chartered, San Francisco, California; Kathy D. Steel, O'Keeffe's, Inc., San Francisco, California, for petitioner.

David A. Levitt, Office of Consumer Litigation, United States Department of Justice, Washington, DC, for respondent.

Before SCHROEDER and TROTT, Circuit Judges, and REED,* District Judge.

Opinion by Judge SCHROEDER; Dissent by Judge REED.

SCHROEDER, Circuit Judge:

I. INTRODUCTION

This is a petition for review of a decision of the United States Consumer Product Safety Commission ("the Commission"), considering a request by the petitioner, O'Keeffe's, Inc. ("O'Keeffe's"). The Commission denied O'Keeffe's petition to amend the Commission's regulations setting impact standards for glass and other glazing materials used in

doors, including storm doors, sliding glass doors, and shower and bathtub enclosures. O'Keeffe's is engaged in the business of manufacturing glazing material that is subject to the impact standards. It petitioned the Commission: 1) to expand the regulations to cover new transparent ceramic materials, made by a competitor, not presently covered by the regulations; and 2) to eliminate the exemption for wired glass in fire doors.

II. BACKGROUND

The Safety Standard for Architectural Glazing Materials was adopted in 1977 "to reduce or eliminate unreasonable risks of death or serious injury to consumers when glazing material is broken by human contact." 16 C.F.R. § 1201.1(a). The impact standards in the regulations apply to all "glass, including annealed glass, organic coated glass, tempered glass, laminated glass, wired glass; or combinations thereof" used for certain architectural purposes. 16 C.F.R. § 1201.2(a)(11). Since 1977, transparent ceramic materials, which have a crystalline structure and which do not meet the definition of glass, have been developed and manufactured. These new transparent ceramic materials are being used for similar architectural purposes but are not subject to the same safety standards as glass-based glazing materials.

In 1977, fire codes required the use of wired glass in fire doors, yet no wired glass existing then could meet the impact standards. Therefore, the regulations exempt "[w]ired glass used in doors or other assemblies to retard the passage of fire" from the impact standards imposed on other glazing materials. 16 C.F.R. § 1201.1(c)(1). Since 1977, technological advances have allowed for the production of glazing materials suitable for fire doors which would survive the impact standards, although wired glass continues to be exempt from the impact standards.

On March 6, 1992, O'Keeffe's submitted a petition to the Commission to amend the Safety Standard for Architectural Glazing Materials, 16 C.F.R. § 1201. O'Keeffe's re-

* Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

quested that the Commission (1) amend 16 C.F.R. § 1201.2(a)(10) & (11) in order to subject glass substitutes such as transparent ceramic materials to the safety standards; and (2) revoke 16 C.F.R. § 1201.1(c)(1), which exempts wired glass used in fire doors from the safety standards. The voluminous record before us contains documentation of meetings, staff research, and evidence submitted by O'Keeffe's and others that was considered by the Commission.

On July 22, 1994, the Commission denied O'Keeffe's petition, concluding that: (1) there was no information available to suggest that either the exclusion of transparent ceramic materials or the wired glass exemption presents an unreasonable risk of injury; (2) such information is unlikely to be developed; and (3) the anticipated benefits of the proposed amendments would not bear a reasonable relationship to their cost. On September 20, 1994, O'Keeffe's timely filed a petition for review with this court.

The Administrative Procedure Act requires that the agency give interested persons the right to petition for issuance, amendment, or repeal of a rule, 5 U.S.C. § 553(e); and the Commission is required to act on any such petition, 15 U.S.C. § 2058(i). This court has jurisdiction to review final actions of the agency under 15 U.S.C. § 2060.

### III. STANDARD OF REVIEW

The Administrative Procedure Act states that a final agency action shall be set aside if it is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *accord Hawaii Helicopter Operators Ass'n v. Federal Aviation Admin.,* 51 F.3d 212, 214–15 (9th Cir.1995).

Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989).

### IV. DISCUSSION

#### A. Transparent Ceramic Materials

O'Keeffe's argues that the Commission failed to consider relevant factors necessary to determine whether ceramics pose an unreasonable risk of injury. O'Keeffe's first contends that the Commission failed to deal adequately with the risk of injury associated with transparent ceramic materials. Underlying O'Keeffe's position is the assumption that, because transparent ceramic materials and the glazing material manufactured by O'Keeffe's are being used for similar architectural purposes, and because the glazing material O'Keeffe's manufactures is regulated, the same level of risk of injury must be associated with transparent ceramic materials as the Commission associated with glass materials in 1977.

This assumption is not correct. To establish an unreasonable risk of injury, the Commission is statutorily required to look specifically at transparent ceramics to determine the nature and the extent of the risk of injury associated with transparent ceramics, the need for transparent ceramics, and the probable effect of the amendment on the utility, cost, and availability of transparent ceramics. *See* 15 U.S.C. § 2058(f)(1). Additionally, the Commission must make and support findings that the amendment is "reasonably necessary" to eliminate or reduce an unreasonable risk of injury associated with the product; that the expected benefits of the amendment bear a reasonable relationship to its costs; and that the amendment imposes the "least burdensome requirement" that prevents or adequately reduces the risk of injury under consideration. 15 U.S.C. § 2059(f)(3). Therefore, the Commission is not statutorily required to compare the breakage characteristics of regulated glazing material with the breakage characteristics of transparent ceramic materials. The Com-

mission's acknowledgment that, if transparent ceramics had existed in 1977, they may have been subject to the regulations is not dispositive. Although similar breakage characteristics may indicate a similar risk of injury, the Commission is required to look at the risk of injury associated with the unregulated product at the current time and in light of data developed since 1977 when the regulations were promulgated. Furthermore, the Commission pointed out that, even if transparent ceramics had existed in 1977, the standard would not necessarily have been written to encompass them. The standard allows for the use of noncomplying glass in several products. 16 C.F.R. § 1201.1(c)(2)–(4).

Upon consideration of the relevant factors, the Commission determined that the evidence does not support a conclusion that transparent ceramic materials pose an unreasonable risk of injury. The Commission considered the information submitted by O'Keeffe's about one incident involving transparent ceramics. That incident involved an item of transparent ceramic in a school door which was broken by a student's elbow. However, O'Keeffe's did not specify whether an injury resulted, and if so, the severity of the injury.

█ The Commission also recognized that the National Electronic Injury Surveillance System ("NEISS") data does not distinguish between injuries involving transparent ceramics and those involving glass. O'Keeffe's argues that, consequently, the Commission cannot rely on the NEISS data to determine whether an unreasonable risk of injury exists and that the Commission must develop more specific data and modify the NEISS database to distinguish between causes of the injuries. However, O'Keeffe's is incorrect in its assertion. The Commission is not statutorily required to conduct an exhaustive study or to revise its data-gathering systems in response to a request for rulemaking. *See Consumer Fed'n of America v. Consumer Prod. Safety Comm'n,* 883 F.2d 1073, 1078 (D.C.Cir.1989) (holding that in determining whether to commence rulemaking under the Federal Hazardous Substances Act, 15 U.S.C. § 1261, the Commission is not obligated to conduct special studies).

O'Keeffe's also suggests that the risk of injury is demonstrated by the fact that local agencies and other regulatory bodies have already imposed some standards upon transparent ceramic materials because of risk of injury on impact. The Commission, however, fully took this into account and concluded that such action by other bodies made regulatory action by the Commission less, rather than more, imperative. The Commission noted in a memorandum that, because model building code bodies and industry groups have issued opinions on the use of transparent ceramics in hazardous locations, "the consumer exposure to hazards presented by the products will be limited." This conclusion was supported by the record and was neither arbitrary nor capricious. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866–67; *Hawaii Helicopter Operators Ass'n,* 51 F.3d at 214–15.

O'Keeffe's contends that this court should apply the reasoning used in *American Horse Protection Ass'n v. Lyng,* 812 F.2d 1 (D.C.Cir.1987), to reverse the Commission's decision. In that case, the Department of Agriculture banned the use of chains weighing more than ten pounds on the legs of show horses for training purposes, but allowed the use of chains of lesser weight because no evidence indicated that horses were injured when trained with the lighter devices. After the rulemaking, a new study revealed that horses were in fact injured by chains weighing less than ten pounds. When petitioners in that case requested the Department of Agriculture to amend the rule, the Department denied the petition primarily due to opposition from the horse owners' association. Upon review, the D.C. Circuit held that the agency had violated the Horse Protection Act and remanded for the agency to consider the validity of the new evidence. *Id.* at 6–7.

*American Horse* is distinguishable from this case, however, because in *American Horse* the agency failed to give any explanation of why it did not take into account a significant intervening study that had indicated that further regulation was required.

*Id.* at 7. Here, there has been no intervening study demonstrating the inaccuracy of a factual presumption underlying the glazing standard or the necessity of regulation. Far from giving the petitioner a cursory rejection, like that in *American Horse*, the Commission considered a great deal of material and reached a reasoned conclusion.

■ In sum, O'Keeffe's contention that the Commission looked only at the cost of amending the regulations, and excluded other relevant factors, fails. The record reveals that the Commission addressed the relevant statutory factors in determining that an amendment to the regulations was not appropriate or necessary. Specifically, the Commission considered the lack of information about injury associated with transparent ceramics; the probability that transparent ceramics would be used for architectural purposes covered by the regulations; the possible effects of an amendment on the cost, utility, and availability of transparent ceramics; and the potential benefits of the requested amendment, potential costs, and the relation between the potential benefits and costs.

Accordingly, the Commission did not act arbitrarily or capriciously in its decision to deny O'Keeffe's request to amend the regulations to include transparent ceramic materials. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866–67; *Hawaii Helicopter Operators Ass'n,* 51 F.3d at 214–15.

### B. Wired Glass

The regulations specifically exempt "[w]ired glass used in doors or other assemblies to retard the passage of fire" from the impact standards imposed on other glazing materials. 16 C.F.R. § 1201.1(c)(1). In 1977, the Commission received comments which stated that: (1) wired glass was the only material available that met the fire resistance requirements of state and local fire codes; (2) wired glass manufactured at the time could not meet the impact standards; and (3) fire doors lacking vision panels made of wired glass would pose a high risk of injury. 42 Fed.Reg. 1430 (1977). The Commission recognized that fire doors with wired glass are in locations which pose a high risk

of injury. *Id.* The Commission also took into account the "serious economic disruptions" likely to occur in the wired glass industry if wired glass was not exempted from the standards. *Id.* at 1439. The Commission ultimately "decided for good cause and in the public interest and safety" to exempt wired glass used in fire assemblies from the impact standards for 2–1/2 years, to allow for technological advances in wired glass. *Id.* at 1430. In 1979, the District of Columbia Circuit found no factual basis in the record for limiting the wired glass exemption to 2–1/2 years and remanded to the Commission. *See ASG Indus., Inc. v. Consumer Prod. Safety Comm'n,* 593 F.2d 1323, 1334–35 (D.C.Cir. 1979). The Commission declined to reopen the record and instead removed the deferred effective date from the regulations, allowing the wired glass exemption to continue indefinitely. 49 Fed.Reg. 7106 (1984).

■ O'Keeffe's suggests that the history of the wired glass exemption indicates that, because the Commission considered regulating wired glass in 1977, the Commission is now acting inconsistently in light of new technological advances in the manufacture of wired glass alternatives. The Commission points out, however, that it reviewed all of the evidence available concerning whether wired glass presently creates an unreasonable risk of injury and concluded that it did not. O'Keeffe's disputes the Commission's conclusion that there is not an unreasonable risk of injury from wired glass, but O'Keeffe's can point to only one injury caused by wired glass in a fire door. That incident involved a student who sustained lacerations to her hand when she pushed against wired glass in a fire door, and the glass broke. Seven other incidents involved injuries resulting from broken wired glass, but they did not involve fire doors.

Again, O'Keeffe's argues that the NEISS data does not distinguish between various types of glazing materials associated with injuries and that the Commission lacked adequate information to reliably estimate the number of injuries associated with accidental breakage of wired glass in fire doors. However, the Commission is not required to conduct special studies or revise its data-

gathering systems in deciding whether to undertake rulemaking. *See Consumer Fed'n of America,* 883 F.2d at 1078. Based on injury reports that were available through NEISS, the Commission estimated that approximately 35 injuries associated with wired glass occur each year. Between 1985 and 1992, NEISS received a total of seven reports of injuries from wired glass that required hospital treatment. None of those injuries were associated with wired glass in a fire door.

As to the cost-benefit analysis, the Commission determined that the average cost of treating an injury associated with wired glass reported through NEISS is $3,400. None of the reported accidents resulted in a fatality. On the other hand, the Directorate for Economic Analysis estimated that the cost of granting O'Keeffe's request to withdraw the exemption for wired glass would be $36 million per year. That estimate was based on the substitution of one of O'Keeffe's products for wired glass. The estimate was also based on O'Keeffe's own cost estimates and assertion that a quantity of one million square feet of wired glass is being used in fire doors. Comments by the Glazing Industry Code Committee opposing the petition indicated that the quantity and the estimated replacement cost would actually be much higher.

O'Keeffe's contends that the Commission's cost analysis was inadequate because it considered only the cost of medical treatment when determining the value of injuries that would be avoided by eliminating the wired glass exemption. This is an inaccurate characterization of the record. The record reflects that the Commission applied the Injury Cost Model to estimate the potential benefits in terms of reduced injuries of implementing the requested amendment. The Injury Cost Model includes hospital costs, foregone earnings, health insurance costs, product liability insurance costs, litigation costs, transportation costs, visitor costs, pain and suffering costs, disability costs, and the valuation of loss of life.

O'Keeffe's further contests the Commission's finding of such high replacement costs by indicating that more cost competitive alternatives are available. However, the Commission considered evidence that the alternatives do not meet water spray tests of the fire standards. Furthermore, the Commission noted that one of the asserted alternatives does not meet the fire retardation rating time requirement, and that another alternative is limited in its application.

Finally, O'Keeffe's contends that the Commission erred by declining to consider the possible savings in replacement costs of glazing materials as a result of eliminating the wired glass exemption. The Commission's decision not to factor in replacement cost savings was reasonable, however, because the information in the record from one school district was not sufficient to make a national estimate of replacement cost savings.

Accordingly, the Commission did not act arbitrarily or capriciously in its decision to deny O'Keeffe's request to eliminate the wired glass exemption. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866–67; *Hawaii Helicopter Operators Ass'n,* 51 F.3d at 214–15.

**PETITION FOR REVIEW DENIED.**

REED, District Judge, dissenting:

The court is faced with something of a bureaucratic mess. In 1977 the Consumer Product Safety Commission, responding to a 1973 petition from an ad hoc group of industry, labor and consumer organizations, promulgated a set of safety standards for the architectural use of glass and other glazing materials. The CPSC regulations required architectural glass to meet certain tensile and thermal performance minima in order to protect consumers from injury resulting from impact with glass architectural elements. Because I believe that the Commission's denial of O'Keeffe's petition to amend the safety standards (1) to include ceramic glazing materials within the regulatory definition of "architectural glazing materials," and (2) to remove an unintended permanent exemption for wired glass used in fire doors, was arbitrary and capricious, and because I believe that the Commission's denial of O'Keeffe's petition leaves unregulated several products which pose an unreasonable risk of serious injury to consumers, I respectfully dissent.

## I. The exemption for fire-door wired glass

Included in the materials covered by the 1977 safety standards was wired glass used in fire doors. At the time, none of the available wired glass products could meet the Commission's safety standards, but nearly every building code required wired glass panels in fire doors. The Commission, faced with a techno-legal collision between its safety standard, the then-current state of glazing technology, and the requirements of federal, state and local building codes, temporarily exempted wired glass used in fire doors from the standard. 42 Fed.Reg. 1428, 1430 (1977).

A trade group representing wired-glass manufacturers petitioned for judicial review of the CPSC standards. The U.S. Court of Appeals for the District of Columbia Circuit found fault with the Commission's inclusion of fire-door wired glass within the safety standard, finding in the administrative record (1) a "substantial showing" that fire-door wired glass exhibited functional characteristics significantly different from the other materials covered by the standard, and (2) the absence of a "process of reasoned decision-making" through which the Commission decided to include fire-door wired glass within the safety standard. *ASG Indus. v. Consumer Prod. Safety Comm'n,* 593 F.2d 1323, 1333 (D.C.Cir.1979).[1]

In addition to its conclusion that the Commission had not satisfactorily demonstrated sufficient functional similarities between fire-door wired glass and other glazing materials to warrant inclusion of fire-door wired glass within the challenged standard, the court also invalidated the Commission's temporary exemption of fire-door wired glass. The court rejected the temporary exemption—which the Commission had devised in order to permit the glass industry time to develop a fire-door wired glass which would meet safety standards—because it found the administrative record "utterly devoid" of any factual basis for the Commission's projection that the limited three-year exemption period

was "meaningful and reasonable." 593 F.2d at 1334.

The Court of Appeals remanded the case to the Commission for reconsideration of both (a) the question whether the functional characteristics of fire-door wired glass merited its inclusion in the safety standard and (b) the factual support for the Commission's decision to defer application of the standard to fire-door wired glass pending technological developments in the near future which would permit the application of the safety standard to fire-door wired glass. *Id.* at 1333, 1334–35.

Following the decision in *ASG Industries,* the Commission abandoned its efforts to promulgate safety standards for fire-door wired glass. In a 1984 amendment to the regulations, the commission deleted the durational limitation on the wired-glass exemption, in effect permanently relieving the manufacturers of fire-door wired glass of any obligation to comply with the safety standards. That amendment allowed the Commission to sidestep its statutory obligation under Section 9(h) of the Consumer Product Safety Act (codified at 15 U.S.C. § 2058(h)) to amend a consumer product safety standard "by rule" pursuant to the notice and comment and the factual findings provisions of that Act. The Commission sought to avoid the procedural requirements for promulgating and amending its rules by stating flatly that the removal of any expiration date on the temporary exemption of fire-door wired glass from the safety standard did not constitute a "material change" in the safety standard. 49 Fed.Reg. 7106, 7107 (1984).

The Commission argued that Section 553 of the Administrative Procedure Act, which requires an agency to afford interested parties notice and the opportunity to comment on a proposed rule did not apply to the deletion of the expiration date because the D.C. Circuit's ruling in *ASG Industries* had already invalidated the temporary exemption. The opinion in *ASG,* however, had expressly qualified its ruling as a "suspension" of the

---

1. The D.C. Circuit did, however, find that the Commission had met the statutory requirements for inclusion within the scope of the challenged safety standard of wired glass in uses other than

in fire doors. *ASG Industries,* 593 F.2d at 1336–37. For that reason the court did not require the Commission to make any additional findings with respect to non-fire-door uses of wired glass.

safety standard's application to fire-door wired glass, and had remanded the case to the Commission "for further consideration and explication." Thus, the *ASG* ruling gave the Commission several options: On remand, it could conduct further factual investigation to support the temporary exemption, or they could delete the exemption. The Commission instead saw fit to abdicate its rulemaking authority, and attempted to evade the procedural requirements of its own organic statute.

The Commission's contention that the amendment deleting the durational limit on the fire-door wired glass exemption effected no "material change" in the safety standard was both cynical and meritless: When an agency action has "palpable effects" upon the regulated industry and the public in general, that action must first be subjected to examination and comment by the affected parties. *National Helium Corp. v. Federal Energy Admin.*, 569 F.2d 1137, 1146 (Temp.Emer.Ct.App.1977). The effect of the Commission's deletion of the durational limit on the exemption of fire-door wired glass from the safety standard was obvious: What was intended as a brief exemption of a dangerous product from the safety standards became permanent. Industry and consumers alike would experience "palpable effects." Wired-glass manufacturers gained a permanent exemption of their product from federal safety standards, and consumers lost the hope that at least at some point in the near future that product would be governed by the Commission's safety requirements. How it could be argued that such a change was somehow not "material" is beyond my ability to fathom. *See, e.g., Duggan v. Bowen*, 691 F.Supp. 1487, 1514 (D.D.C.1988) (finding HHS letter ruling limiting certain types of Medicare coverage to have effected "material changes," thereby requiring agency to comply with APA notice-and-comment provisions for "rules").

Having thus won its permanent exemption from the safety standard, the wired glass industry, predictably, chose not to litigate the matter further. In 1992 Petitioner O'Keeffe's, a manufacturer of glazing materials, petitioned the CPSC to remove the inad-

vertently—and irresponsibly—permanent exemption of fire-door wired glass from the 1977 safety standards. O'Keeffe's sought to persuade the Commission that in the intervening decade and a half the glazing industry had developed materials capable of (a) complying with federal, state and local fire codes and (b) meeting the impact-resistance and breakage-pattern requirements of the Commission's 1977 safety standards. In other words, there were now available transparent building materials which entirely obviated the fire-door wired glass exemption.

The Commission rejected O'Keeffe's petition for removal of the wired glass exemption. Its reasoning, for lack of a better word, was that there was insufficient evidence *in the 1992 record* that the installation of wired glass in fire doors posed an unreasonable risk of serious injury. As O'Keeffe's pointed out, however, such an explanation is unworthy of credit. From the evidence assembled in the 1992 proceedings the Commission estimated that approximately 35 people are injured each year in collisions with the wired glass panels in fire doors. The Commission found further that these injuries "are not superficial," and that treatment of each wired-glass injury costs around $3,400.

If the Commission properly concluded in 1977 that fire-door wired glass presented an unreasonable risk of injury, and exempted it from the standard only because there then existed no fire-rated non-wired alternative, what possible difference could the number of injuries *in the 1992 record* make?

The prohibition on the use of wired glass which fails to meet the safety standards except in fire doors may well have reduced the number of injuries resulting from all uses of wired glass. That fact says nothing about the continued risk of injury from fire-door wired glass. The Commission's argument that the recording of fewer wired-glass injuries today renders unnecessary application of the safety standard to fire-door wired glass is "so implausible that it c[an] not be ascribed to a difference in view or the product of agency expertise." The Commission's denial of O'Keeffe's' rulemaking petition is therefore subject to judicial reversal as "arbitrary and capricious" within the meaning of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

The CPSC concluded that the great disparity between the total cost of all fire-door wired glass injuries and the cost of including fire-door wired glass within the 1977 safety standards compelled it to reject O'Keeffe's' petition for rulemaking. The CPSC reckoned the latter cost at $36 million, a figure arrived at by multiplying the cost per square foot of wired glass ($36) by the number of square feet of wired glass installed annually in the United States (1 million square feet). The Commission calculated the total cost of all the estimated wired glass injuries by multiplying the estimated number of annual injuries by the average cost of emergency-room treatment for those injuries. 3 E.R. P00625.

The Commission did not include in its injury-cost calculus any expenses other than emergency-room treatment costs. The record does not mention the cost of replacing broken wired-glass panels, the amount of wages lost due to wired-glass injuries, or a monetary reckoning of the human costs in pain and suffering resulting from those injuries. To this extent, therefore, the Commission "entirely failed to consider an important aspect of the problem." Such a failure renders their decision to deny the petition "arbitrary and capricious." *Motor Vehicle Mfrs. Ass'n, ibid.*

It is simply not possible to ascribe the Commission's refusal to remove the permanent exemption for fire-door wired glass to any reasoned decisionmaking process. That exemption was neither crafted nor desired by the agency. It was the accidental result of the confluence of a judicial decision, which certainly did not contemplate the results here obtained, and pure bureaucratic sloth. The Commission's failure in 1984 to follow the recommendation of the Court of Appeals in *ASG Industries* created the problem. The Commission's reluctance to correct its error appears to derive more from sheer indolence than from rational analysis of the evidence and competing interests.

The Commission's own brief recites the two traditional grounds for judicial requirement that an agency reconsider its refusal to institute rulemaking. One is where "a significant factual predicate of a prior decision ... has been removed." *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C.Cir.1981). The fire-door wired glass exemption was predicated on the unavailability in 1977 of glazing materials which could meet both the agency breakage pattern and impact-resistance standards and the federal, state and local building codes which required a transparent panel in doors designed to impede the passage of fire. That factual predicate no longer obtains: Such materials have become available.

## II. The definition of "architectural glazing materials"

In addition to its petition for removal of the permanent fire-door wired glass exemption, O'Keeffe's petitioned the CPSC for an amendment expanding the scope of the 1977 safety standards to include glazing materials other than traditional glass. The definitions section of the safety standards limited their coverage to "glass, annealed glass, organic coated glass, tempered glass, organic coated glass, laminated glass, wired glass; or combinations thereof" when used in hinged or sliding doors, storm doors, and bathtub and shower enclosures. 16 C.F.R. §§ 1201.1(a), 1201.2(a)(11)(1995). The word "glass" within the meaning the safety standards means "a hard, brittle, amorphous substance produced by fusion, usually consisting of mutually dissolved silica and silicates that also contains soda and lime." 16 C.F.R. 1201.2(a)(9).

When the definitions were composed in 1977, they described "the known universe of architectural glazing materials." Pet. Brief at 8. Since then, transparent building materials resistant to heat have been developed from materials other than amorphous silicates. Modern glazing materials may be made from the traditional silicates, or from ceramic ingredients. They look the same, but are not the same: Ceramic glazing materials, though heat-resistant, are much less resistant to breakage. Ceramic "glass" breaks like annealed glass, and when broken shatters in dangerous patterns.

In 1989 the distributor of a fire-rated ceramic glazing product called "Firelite" received from the CPSC an informal ruling that Firelite, being made of crystalline, rather than amorphous ingredients, did not need to meet the 1977 safety standards. E.R. A, at 17–18. That letter ruling was, as O'Keeffe's points out, while technically correct, inconsistent with the original stated purpose of the safety standards. Throughout the regulations, the materials covered are described generically as "architectural glazing materials" precisely because the Commission "intended the standard to cover glass *and non-glass materials*". 42 Fed.Reg. 1428, 1428 (1977) (emphasis added). A 1990 glazing industry newsletter complained that the Firelite letter ruling ignored the fact that, while chemically distinct from glass, Firelite served the same purpose as glass, and posed risks of injury similar to those associated with glass, but was now exempt from the federal safety standards. E.R. A, at 28.

There are now on the market a number of glass products which meet the fire-resistance requirements of federal, state and local building codes. Because they are amorphous, they are subject to the 1977 impact and breakage pattern standards. By contrast, the crystalline glazing products now being marketed are excluded from those standards, though they are used like glass and present the same risks of injury as glass.

It was this situation which prompted O'Keeffe's' 1992 petition to the CPSC to amend the definitions in the 1977 safety standards. O'Keeffe's manufactures fire-rated architectural glass under the brand names "Contraflam," "Pyroswiss," and "Superlite I." These products must meet federal safety standards. O'Keeffe's' ceramics and wired-glass competitors are, at present, exempt from those same standards.

The Commission refused to amend the definition of architectural glazing materials to include crystalline, or ceramic materials. It claimed it had no basis on which to conclude that ceramic glazing posed an unreasonable risk of injury. O'Keeffe's has argued that the very facts that (a) ceramic glazings are used in the same way as annealed glass and (b) that at present those ceramics fail to meet the Commission's own safety standards should be enough to conclude that ceramics present the same risks of injury that non-complying annealed glass presents. O'Keeffe's logic is unassailable. O'Keeffe's presents a simple syllogism:

1. Glass which does not meet the safety standards poses an unreasonable risk of injury.
2. Ceramics look like glass, act like glass, and are installed in the same places as glass.
3. Ceramics do not meet the safety standards.
4. Therefore, ceramics pose an unreasonable risk of injury.

The majority insists that "there is no evidence in the record to support [the] assumptions" that the unregulated ceramic glazings look, act, and are used in the same way as the regulated silicate glazings. The majority ignores several important items of evidence which were in the record at the time the Commission denied O'Keeffe's petition.

First, there was evidence in the record that ceramic respond to impacts in the same manner as glass: Ceramic glazing materials failed impact tests under the same load as annealed glass. Both materials failed under a load of only 40 foot-pounds. E.R. A, at P00031.[2] Second, the Commission itself admitted that glass and transparent ceramics appear identical to the naked eye, see E.R. G at P00620, and indeed conceded that had ceramic glazings existed at the time of the

---

**2.** Petitioner engaged engineers to conduct impact and breakage pattern tests on wire glass, annealed glass, ceramic glazing materials, and Petitioner's treated glass products, using the Commission's own test methods. E.R. A, at P00031. The Commission tests architectural glazing materials under the test methods prescribed by the American National Standards Institute ("ANSI"). 16 C.F.R. § 1201.4(a). The

material is set in a frame, and a leather punching bag filled with lead shot is suspended from a string attached to a stand. The punching bag, or "impactor," is aimed at the center of the subject material and swung towards the glass. 16 C.F.R. § 1201.4. Schematic diagrams of the test apparatus appear at 16 C.F.R. Pt. 1201, Subpt. A, Figs. 1 to 5; *see also* 41 Fed.Reg. 6183–84 (1976).

drafting of the original definition, they would have been included. *Id.* Third, there was evidence in the record that one of O'Keeffe's competitors markets a ceramic glazing intended precisely for use in fire doors. E.R. A at P00020. The majority refuses to assume that non-complying ceramics which break like non-complying glass will cause the same injuries when shattered. It requires no great leap of logic to conclude that ceramic glazing panels in fire doors pose precisely the same risks of injury as annealed glass in fire doors.

The Commission was not satisfied with the undisputed evidence that *if* ceramic glazing materials were installed like glass, they would shatter and injure like glass. The Commission stubbornly proclaimed that "information is not now available to establish that ... noncomplying transparent ceramics in any of the products subject to the standard present an unreasonable risk of injury." CPSC Decision, E.R. K, at P00767.

But to the extent the Commission required a litany of documented injuries from human collisions with ceramic glazing materials, the Commission misapprehended applicable law. There is no requirement in the CPSA that before promulgating a safety rule the Commission "develop a precise body count of actual injuries" caused or likely to be caused by the product under consideration. *Forester v. Consumer Prod. Safety Comm'n,* 559 F.2d 774, 788 (D.C.Cir.1977) (internal quotation marks omitted). As Congress recognized, "[w]hen your intelligence tells you that something will create an injury and that it seems conceptually clear that an injury will occur, it is primitive to wait until a number of people have lost their lives, or sacrificed their limbs before we attempt to prevent those accidents." [3]

To this extent, then, the Commission offered an explanation for its decision to deny O'Keeffe's petition that runs counter to the evidence before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S.

29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Hawaii Helicopter Operators Ass'n v. Federal Aviation Admin.,* 51 F.3d 212, 214, 215 (9th Cir.1995). There was evidence that transparent ceramics were being used in fire doors, and there was evidence that those ceramics behaved exactly like annealed glass.

**Conclusion**

The Commission's factual and political determinations appear to lack adequate basis in the record. The facts found by the Commission and the legislative considerations which it took into account could not by themselves lead a reasonable person to make the judgment the Commission has made. *Natural Resources Defense Council v. S.E.C.,* 606 F.2d 1031, 1053 (D.C.Cir.1979).

An agency may, in rare circumstances, be forced by a reviewing court to institute rulemaking if a significant factual predicate of a prior decision on the subject has been removed. *American Horse Protection Ass'n v. Lyng,* 812 F.2d 1, 5 (D.C.Cir.1987) (citing *Geller v. FCC,* 610 F.2d 973 (D.C.Cir.1979)). Given the Commission's behavior following the decision in *ASG Industries,* it does not appear that it can be trusted to follow judicial instructions to reexamine the factual support for its decisions. The court should take the unusual measure of requiring the Commission to engage in rulemaking to consider removing the fire-door wired glass exemption from the safety standards and to consider redefining "architectural glazing materials" to include ceramic glazing products.

For the foregoing reasons, I dissent.

---

3. S.Rep. No. 91–237, 91st Cong., 1st Sess. 2–3 (1969) (quoting testimony of Arnold Elkin, Chairman of the National Commission on Product Safety, in support of the Consumer Product Safety Commission's authority under the Federal Hazardous Safety Act to issue regulations where a product presents an unreasonable risk of personal injury or illness—a standard nearly identical to the standard under which the same Commission may regulate products under the CPSA) (*Quoted in Forester,* 559 F.2d at 788–89).